Argued and submitted December 9, 2008, accused disbarred, commencing 60 days from date of filing of decision September 3, 2009

In re Complaint as to the Conduct of

## LAUREN J. PAULSON,
*Accused.*

(OSB 05-187, 06-05, 07-19, 07-20, 07-21, 07-22; SC S055610)

216 P3d 859

677-a

Lauren J. Paulson, Aloha, argued the cause and filed the briefs *in propria persona*.

Stacy J. Hankin, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar, alleging 13 causes of complaint, charged the accused with violating provisions of the Oregon Code of Professional Responsibility Disciplinary Rules (DRs) (applicable to conduct before January 1, 2005) and the Oregon Rules of Professional Conduct (RPCs) (applicable to conduct on and after January 1, 2005). Specifically, the Bar alleged that the accused violated DR 1-102(A)(4) and RPC 8.4(a)(4) (conduct prejudicial to administration of justice); DR 2-106(A) (charging a clearly excessive fee); RPC 1.16(a)(1) (failure to withdraw from representation when representation will result in violation of RPC or other law); RPC 1.16(d) (failure to take steps to protect client's interest after termination of representation); RPC 3.3(a)(1) (knowingly making false statement of law or fact to tribunal); RPC 5.5 (unauthorized practice of law); RPC 8.1(a)(2) (failure to respond to lawful requests of disciplinary authority); and RPC 8.4(a)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on lawyer's fitness to practice law).[1] A trial panel of the Disciplinary Board concluded that the accused had violated the rules as alleged. As a sanction, the trial panel disbarred the accused.

The accused seeks review pursuant to ORS 9.536(1) and Bar Rule of Procedure (BR) 10.1. Our review of the trial panel's decision is *de novo*. ORS 9.536(2); BR 10.6. In disciplinary proceedings, the alleged misconduct must be established by clear and convincing evidence. BR 5.2. "Clear and convincing evidence" means evidence establishing that the truth of the facts asserted is highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985).

---

[1] As a corollary to the alleged violations of RPC 5.5 (unauthorized practice of law), the Bar also alleged that the accused violated ORS 9.160 (practicing law while not an active member of the bar). The trial panel found a violation of ORS 9.160, but recognized that it had no independent significance because RPC 5.5 implements that statute. *See In re Kimmell*, 332 Or 480, 487, 31 P3d 414 (2001) (violation of provision of ORS chapter 9 generally has no effect on sanction that this court imposes for violations of disciplinary rules). We therefore discuss only the alleged violations of RPC 5.5.

In his brief to this court, however, the accused does not challenge the trial panel's factual findings, its conclusions that he violated the disciplinary rules, or the disbarment sanction that the trial panel imposed for those violations. The accused's questions presented and substantive arguments address only procedural issues and issues that he has styled as "affirmative defenses" to the alleged violations that he asserts require dismissal of the complaint against him.[2] At most, through certain assertions made in his summary of facts, the accused indirectly takes issue with limited aspects of the trial panel's findings and conclusions.

Although the accused's arguments do not invite our full *de novo* review of the causes of complaint, we have reviewed the entire record and the trial panel's findings and conclusions.[3] The trial panel's opinion in this matter is comprehensive, detailed, and generally incisive. Because of the manner in which the accused has limited his challenges to the trial panel's opinion, we do not discuss the evidence presented to the trial panel—which is voluminous—in painstaking detail. Even so, due to the number and variety of violations that the accused is alleged to have committed, our discussion is extensive. In the sections that follow, we summarize the record and the trial panel's findings and conclusions, identify our agreement with those findings and conclusions, and respond as appropriate to the challenges—albeit indirect—that the accused makes to the trial panel's findings and conclusions. We then turn to an examination of the procedural issues that the accused raises, including his

---

[2] The accused's choice to so limit his challenges to the trial panel's opinion is similar to how he presented his challenges on review in his most recent prior disciplinary proceeding. *See In re Paulson*, 341 Or 542, 544, 544 n 2, 145 P3d 171 (2006), *cert den*, 549 US 1304 (2007) (*Paulson III*). Indeed, as we will later discuss, many of the "affirmative defenses" that the accused raises in this proceeding are ones that we rejected, some as a matter of law, in our prior decision.

[3] Until 2003, this court automatically reviewed a decision to suspend for more than six months or to disbar an Oregon State Bar member, even when the accused did not respond to the charges against him, did not seek review of the findings of disciplinary violations, and did not challenge the sanction imposed. ORS 9.536(2) (2001), *amended by* Or Laws 2003, ch 192, § 4; *see, e.g., In re Vesely*, 332 Or 165, 167 n 1, 26 P3d 801 (2001) (so observing). That is no longer true. Now, if neither the Bar nor the accused seeks review, the trial panel's decision "shall be final." ORS 9.536(1). Although our standard of review remains *de novo* (ORS 9.536(2)), ordinarily we will consider the issues for our review to be those framed by the parties' briefs and arguments.

"affirmative defenses." Finally, although the accused does not challenge the appropriateness of the sanction of disbarment, we address that question.

For the reasons that we explain below, we conclude that the accused has committed all the violations alleged by the Bar and found by the trial panel. We also conclude that the appropriate sanction is disbarment.

## I. BRADY-AIELLO MATTER

### A. *Factual Background*

The Bar's first three causes of complaint arose out of the accused's handling of an estate matter. The Bar alleged that the accused violated four rules in his handling of the Brady-Aiello matter: DR 1-102(A)(4) and RPC 8.4(a)(4) (conduct prejudicial to administration of justice);[4] DR 2-106(A) (charging clearly excessive fee); and RPC 8.1(a)(2) (failure to respond to lawful requests of disciplinary authority).

The trial panel's opinion sets out an extensive and detailed recitation of factual findings relevant to this matter, complete with citations to the record. We have reviewed both the trial panel's findings and the record in full. Based on that review, we provide the following summary of what occurred.

The accused represented a disabled man (Brown) and prepared both a living trust and a pour-over will for him. Under Brown's will, the accused was made the personal representative of the estate, all of which was devised to Brown's caregivers, Trudy Brady-Aiello and Michael Aiello. Under the trust, the accused succeeded Brown as trustee upon Brown's death. Brown died in 2001. Because both Brown and his wife, who predeceased him, had received state health assistance during the last years of their lives, the state had two priority claims against Brown's estate. The estate consisted of only a few assets, and there were only a few claims against those assets (*e.g.*, the state's claims, hospital claims, and a few other routine creditor claims). Settling the estate

---

[4] Because the accused's conduct in this matter occurred both before and after the January 1, 2005, date on which the Oregon Rules of Professional Conduct replaced the Oregon Code of Professional Responsibility, both DR 1-102(A)(4) and RPC 8.4(a)(4) apply.

and distributing the assets should have been a straight-forward process for all concerned. But, due to the accused's conduct, it was not.

Although often representing that he stood ready to distribute the assets, the accused delayed and failed to do so. Eventually, the beneficiaries were forced to retain independent counsel. Some 17 months after Brown's death, the accused finally filed a small estate matter in probate court. The state then made two formal claims against the estate to recover the medical assistance paid on behalf of Brown and his wife. The accused, however, disallowed the claims, forcing the state to petition the court. In that and other respects, the accused, who was frequently suspicious and distrustful of the beneficiaries and their lawyers, often treated the process of settling the estate and distributing the estate as an adversarial one. Eventually, by court order, the accused was removed and replaced as trustee of the trust and personal representative of the estate. That occurred more than two and a half years after Brown's death. The new personal representative settled the estate and distributed the assets within a year after taking over. The only significant complications that the new personal representative encountered were the accused's failure to turn over various items in the estate (including access to a safe deposit box) and the accused's filing of an attorney fee lien against the estate for fees that the court, in removing the accused as personal representative, had told the accused that he could not collect. Once the lien was dismissed and the new personal representative had access to the materials and information that he needed from the accused, the estate matter was completed within a few months.

We do not relate, detail by detail and date by date, the series of failed meetings, frustrated negotiations, and protracted court proceedings that are described in the trial panel's extensive findings of fact. We do, however, quote in full the trial panel's summary of and assessment of those facts:

"The Brady-Aiello matter became a nightmare for virtually everyone involved solely because of the actions taken by the Accused. As noted above, this matter arose out of the death of Alan Brown. He had two beneficiaries, Trudy

Brady-Aiello and Michael Aiello. There were no other beneficiaries to the estate, and only a single claim made against the estate assets. The bulk of the estate was in a trust and should have passed without fanfare or issue to the Aiellos. Unfortunately, each action taken by the Accused seemed designed to lengthen the process. When he was removed as trustee of the estate in May 2004, nearly three years after the decedent's death, the title to a single asset had not yet passed to the beneficiaries.

"In a case where most beneficiaries would not need independent counsel, three separate lawyers represented the beneficiaries over the 31 months the Accused was involved. Hundreds and hundreds (perhaps thousands) of dollars in attorney fees were incurred on behalf of the beneficiaries and paid for by the estate. Despite an order to provide one, the Accused never provided the beneficiaries with a complete accounting. He filed an interpleader action, which all lawyers who testified or wrote on the issue indicated was unnecessary. He disallowed legitimate claims of the State of Oregon in the small estate matter, refused to seriously consider settlement of those claims, and then told a circuit court judge in open court that he had not denied any claim against the estate. He directed his legal assistant to draft a special power of attorney for Michael Aiello to sign so his wife, Trudy Brady-Aiello, could handle all estate matters, reviewed the special power of attorney, billed for his time, and then refused to honor the special power of attorney. He was rude, obstreperous and evasive in his deposition. His answers rose to the level of misrepresentation. He frequently responded to questions by saying he could not answer without looking at his file, but had taken steps to make the file unavailable at the time of his deposition. At the deposition of his legal assistant and office manager, he directed her not to review the file despite a subpoena duces tecum which required that file be present. He opposed a motion to consolidate on the ground there were no common issues of law and fact, but argued the interpleader action should go forward for that very reason. He continually offered to either settle the matter or mediate the dispute in a fashion that indicated the offer to do so was specious. In fact, there was nothing to mediate. The beneficiaries wanted to resolve the claim of the state in the manner negotiated by Grant [the Aiellos' attorney], and the Accused refused. He unnecessarily antagonized at least one circuit court judge for no reason the panel can find, to the potential

detriment of his client. He collected fees in the small estate matter without court approval. By charging the same work to multiple files, he was found by the court to have double billed. He commingled entries on matters that needed to be segregated. A circuit court judge ordered his attorney fee lien dissolved and ordered repayment of $14,000 in fees he collected from the estate improperly. He was ordered to provide access to a safe deposit box the next day, but took nearly two months to comply with the order. Ultimately, he was removed as trustee, but even then balked when it came to transferring all of the necessary file materials."

With that factual backdrop, we turn to the particular violations that the accused was alleged to have committed based on his conduct in the Brady-Aiello matter.

### B. *DR 1-102(A)(4) and RPC 8.4(a)(4)*

DR 1-102(A)(4) and RPC 8.4(a)(4) prohibit a lawyer from engaging in conduct that is prejudicial to the administration of justice. To establish a violation of those rules, the Bar must show that:

"(1) the accused lawyer's action or inaction was improper; (2) the accused lawyer's conduct occurred during the course of a judicial proceeding or a proceeding with the trappings of a judicial proceeding; and (3) the accused lawyer's conduct had or could have had a prejudicial effect upon the administration of justice. The administration of justice includes both the procedural functioning of the proceeding and the substantive interests of parties to the proceeding. Prejudice may arise from several acts that cause some harm or a single act that causes substantial harm to the administration of justice."

*In re Kluge*, 335 Or 326, 345, 66 P3d 492 (2003) (synthesizing test from *In re Haws*, 310 Or 741, 746-48, 801 P2d 818 (1990)) (citations omitted).[5]

Regarding the second element (occurring in the course of a judicial proceeding), the trial panel determined

---

[5] As earlier noted, the accused's conduct occurred both before and after January 1, 2005, which was the date on which the Rules of Professional Conduct replaced the Disciplinary Rules. RPC 8.4(a)(4) is identical to DR 1-102(A)(4). Case law identifying the requirements of DR 1-102(A)(4) therefore is pertinent to our analysis under RPC 8.4 that replaced it.

that the accused's conduct, which occurred over almost a three-year period, encompassed three court actions filed in connection with Brown's small estate and trust matters, discovery depositions, the denial of legitimate state priority claims against the estate, and refusals to comply with court orders. Regarding the third element (prejudicial effect), the trial panel's pertinent findings and conclusion included that the accused's conduct (1) forced the Aiellos to hire multiple lawyers and to suffer needless upset, anxiety, and delay in the distribution of Brown's simple estate; (2) the accused's conduct forced the state to initiate costly legal action to obtain payment of a legitimate lien, one that the estate eventually settled; (3) despite a court order, the accused refused to turn over the records of the estate, which then required additional legal action to obtain the accused's compliance; (4) the accused purposely obstructed a discovery deposition of his legal assistant; and (5) the accused refused to distribute the estate because Michael Aiello was unable to be personally present for the distribution, even though the accused had prepared and his office had notarized a special power of attorney for Trudy Brady-Aiello to exercise if Michael Aiello could not be present.[6] As the trial panel concluded, the evidence amply satisfies both the second and third elements. *See In re Gresham*, 318 Or 162, 166, 864 P2d 360 (1993) (probate lawyer engaged in conduct prejudicial to the administration of

---

[6] The accused assisted in preparing the special power of attorney so that Trudy Brady-Aiello could act on Michael Aiello's behalf because the Aiellos knew that Michael was about to be incarcerated due to a drug conviction. Had the accused not required Michael's personal presence as a condition of settling the estate, and had the accused instead permitted Trudy to sign for Michael using the special power of attorney, the estate might have been settled and distributed as early as May 2002, just seven months after Brown's death. The accused's only explanation for his refusal to honor the special power of attorney was that Trudy did not produce the "original" special power of attorney for him. At the hearing before the trial panel, the trial panel asked the accused why he had insisted on having the original document produced, when he had personally reviewed the special power of attorney (according to his billings) and his own staff had notarized it. The accused's only explanation was that an original is always necessary. The panel found the accused's answer unsatisfactory, as do we. We note, moreover, that there is no evidence that the accused ever informed Trudy that the original document was necessary or that he did anything else to affirmatively assist in overcoming whatever obstacles the accused thought existed to settling the estate. Instead, the accused passively waited for the beneficiaries and their attorneys unilaterally to determine what the obstacles might be and to overcome them without the accused's assistance.

justice when the lawyer took an extended period of time to close an estate and repeatedly failed to "do anything to administer the estate," requiring the trial court to make repeated requests for information). The accused does not argue otherwise.

As to the first element—improper or illegal conduct on the accused's part—the trial panel's opinion indentifies numerous improper actions and inactions by the accused. Many are set out in the material quoted from the trial panel's opinion above. The accused does not directly take issue with any of those particular facts or conclusions. He does, however, appear to take indirect issue with them. Specifically, in his summary of facts (but not in his questions presented or his substantive arguments), the accused states that "Tab 5" of his Exhibit 203 "is the solitary document that exculpates [the accused] completely"; that it demonstrates his "painstaking efforts" to distribute the estate; and that it contains "[13] specific, documented overtures by [the accused] to resolve the estate long before Judge McElligott intervened to [remove the accused as the personal representative of the estate] in 2004 * * *." At the hearing before the trial panel, the accused similarly testified that Tab 5 was the "lynchpin" to demonstrate that he acted properly.

We have reviewed "Tab 5" in full. It consists of 18 documents or parts of documents. A few are undated draft pleadings or stipulations. The remainder are dated and signed letters that the accused sent in 2002, 2003, and 2004, to various individuals in connection with the estate matter—individuals such as the Aiellos, their attorneys, and the attorneys who represented the state on its claim. The accused's only argument as to how those documents "exculpate[ ]" the accused "completely" is that the letters often stated that the accused was willing and able to distribute the estate, and often invited the recipients to contact him or set up meetings for that purpose. The evidence is overwhelming, however, that his words in those letters did not match his conduct.[7]

---

[7] Most of the individuals who received those letters testified at the disciplinary hearing and described conduct on the accused's part that was wholly at odds with his professed willingness to settle the estate and distribute the assets. Sometimes, the witnesses themselves identified the contradiction. For example, Goodwin, a lawyer who represented the state on its claim, specifically acknowledged that the

Despite his professed willingness to distribute the estate, the accused took few or no significant steps to facilitate matters. At best, he was frequently passive and waited for others to take the initiative. More often, the accused delayed, frustrated, and even actively interfered with efforts to settle and resolve claims against the estate and distribute the remaining assets to the beneficiaries. The accused's actions and inactions in those regards were improper. Moreover, as the trial panel found, the accused's improper conduct was sufficiently persistent over time as to reflect a "disturbing pattern" on the accused's part, especially when considered in the context of highly similar past conduct on the accused's part that had resulted in formal discipline.[8]

The Bar has proved by clear and convincing evidence that the accused engaged in conduct prejudicial to the administration of justice, in violation of DR 1-102(A)(4) and RPC 8.4(a)(4).

## C. *DR 2-106(A)*

■ DR 2-106(A) prohibits a lawyer from charging an illegal or clearly excessive fee. The Bar alleged and the trial panel found that the accused, by comingling his billings as personal representative with those for his work as trustee in

---

accused "would make comments in letters saying things like, 'I'm ready and willing to distribute the assets,' but nothing would happen." With time, "it became fairly clear that [the accused] wasn't really * * * willing to distribute [the assets] * * *." Instead, in Goodwin's opinion, the accused transformed the matter into "a real mess" and a "tar pit for attorney fees," with the accused taking steps that were designed to "stretch this out and generate more fees."

[8] In *In re Paulson*, 341 Or 13, 136 P3d 1087 (2006), *cert den*, 549 US 1116 (2007) (*Paulson II*), this court suspended the accused for conduct that similarly impeded, rather than aided, the resolution of litigation for a client. The court concluded that the accused's individual actions might not necessarily rise to the level of misconduct, but, cumulatively, they were "so egregious as to warrant sanction." *Id*. at 27. The court explained:

"At virtually every point in the litigation, the accused made a decision that placed [the accused's clients] in an ever more vulnerable legal and financial position. Each time that the accused ignored or violated a procedural rule, the litigation became more complicated, protracted, and expensive, and ultimately served to prejudice the administration of justice."

*Id*. at 29. We agree with the trial panel that the accused's past conduct, given its strong similarities to his conduct here, demonstrates the pervasive nature of the accused's behavior.

connection with the Brady-Aiello estate matter, double-charged for certain services and collected $14,000 without the statutorily required permission of the court. *See* ORS 116.173(1) (setting out fees to which a personal representative, "[u]pon application to the court[,]" may seek for services). On review, the accused does not address the trial panel's findings or conclusions with regard to the violations of DR 2-106(A). Having reviewed the record as it pertains to that cause of complaint, together with the findings and conclusions of the trial panel, we conclude that the Bar has proved that the accused violated DR 2-106(A) in this matter. *See In re Knappenberger*, 344 Or 559, 564, 186 P3d 272 (2008) (accused violated rule when he charged a fee that, by law, required authorization by Social Security Administration without obtaining that authorization).

D. *RPC 8.1(a)(2)*

■ In part, and as relevant here, RPC 8.1(a)(2) provides that a lawyer shall not, in connection with a disciplinary matter, "knowingly fail to respond to a lawful demand for information" from a disciplinary authority. As a final cause of complaint in connection with the Brady-Aiello matter, the Bar alleged that the accused had violated RPC 8.1(a)(2). On review, the accused does not challenge the trial panel's findings of facts and conclusions in that regard.

In concluding that the accused violated RPC 8.1(a)(2) when the Bar attempted to investigate the Brady-Aiello matter, the trial panel specifically found:

"The Accused failed to fully and truthfully respond to the Bar's repeated requests for information. Many responses were intentionally non-responsive to the specific inquiries made by the Bar, others offered nothing of substance. Indeed, on a number of occasions relating to the various cases at issue in the proceeding, the Accused didn't respond at all. We conclude therefore that the Accused acted knowingly in his failure to respond to the Bar's inquiries. It is clear he intended to give the Bar as little information as possible while attempting to preserve his ability to argue that he was attempting to be cooperative and responsive. We also recognize the Accused feels he is being persecuted by the Bar. He feels this stems from his activity relating to a disciplinary task force and his work on

the Board of Bar Governors. We recognize the Accused's feelings are sincere and strongly held. However, he has not proven that his suspicions are true. His decision to express these feelings by being evasive only strengthens our conclusion that he chose not to cooperate with the Bar's investigation [except] in the most *de minimus* of manners. Our ethical rules require more than what the Accused provided."

The trial panel's findings and conclusions in that regard are significantly demeanor based, and we defer to them. *See In re Fitzhenry*, 343 Or 86, 103, 162 P3d 260 (2007) (this court defers to credibility determinations of trial panel in disciplinary proceedings). We conclude, as did the trial panel, that the accused, on some occasions, failed to respond at all to the Bar's investigatory requests; on other occasions, the accused responded incompletely and insubstantially to the Bar's requests. We further conclude that the accused did so with at least the knowing mental state that the rule requires.[9] The Bar has proved that the accused violated RPC 8.1(a)(2) (failure to respond to lawful requests of disciplinary authority) in this matter.

## II. THE RUBEO MATTER

■ Shannon Rubeo filed a complaint with the Bar regarding an employment matter that the accused handled for her. After investigating the complaint, the Bar apparently determined that the accused had not violated any disciplinary rules in his handling of Rubeo's employment matter, because it filed no causes of complaint in that regard. The Bar did, however, allege that the accused violated RPC 8.1(a)(2) (failure to respond to lawful requests of disciplinary

---

[9] In its opinion, the trial panel concluded that, although there are differences between the text of RPC 8.1(a)(2) and its predecessor, DR 1-103(C), the essential obligation to respond fully and truthfully to an investigatory request from the Bar is the same under both the current and former rules. We have no occasion in this case to examine any possible substantive differences between the two rules, given the accused's failure to raise any challenge to the trial panel's analysis or its application of the rule to him. The only difference of significance for our purposes here is that RPC 8.1(a)(2) contains an express requirement that DR 1-103(C) did not—that of a knowing mental state. As we discuss further in connection with the appropriate sanction to be imposed, we conclude that the accused acted intentionally—not just knowingly—with respect to several of his failures to adequately respond to the Bar's investigatory requests. *See* 346 Or at 713.

authority) during the course of the Bar's investigation of the Rubeo complaint.

The trial panel found that the accused failed to respond to the Bar's initial request for information and then, after multiple reminders, he responded incompletely. The trial panel further found it "noteworthy" that, "in almost every letter the Bar sent to the Accused in this matter, the Accused was advised that his failure to cooperate with and/or respond to the Bar's requests" would be contrary to RPC 8.1(a)(2). Even so, whether the accused's failure to cooperate violated the rule was a "close case" in the trial panel's view, in part because of the tension that had developed between disciplinary counsel and the accused. On that score, the trial panel, while suggesting that there may have been sufficient blame to go around, specifically found that, had the accused provided a copy of the Rubeo file to the Bar when initially requested, "this matter would not now be before us." Given the precipitating role of the accused's initial noncooperation, together with his later incomplete responses to the Bar's inquiries, the trial panel concluded that the accused had "failed to respond to a lawful demand for information," in violation of RPC 8.1(a)(2).

The accused does not challenge any of the trial panel's findings or conclusions regarding his noncooperation with the Bar's investigation of the Rubeo complaint. Rather—and again, only through statements in his summary of facts and not through direct argument—the accused asserts that his handling of the Rubeo matter, which involved a fee dispute, never should have been referred to the disciplinary counsel's office, thus suggesting that the Bar's investigation was inappropriate.

The fact that Rubeo's complaint, after investigation, was apparently dismissed is—at least in and of itself—irrelevant. The accused has neither argued nor demonstrated that Rubeo's complaint to the Bar did not raise at least an arguable complaint of misconduct, one that the Bar had legal authority to investigate. *See* ORS 9.542 (Board of Governors of the Bar authorized, subject to Supreme Court approval, to adopt rules governing investigations of conduct of attorneys); BR 2.5(b)(1) (if complaint presents "sufficient evidence to

support a reasonable belief that misconduct may have occurred," complaint will be referred to Disciplinary Counsel). As this court has noted in past cases, a significant number of complaints against Bar members can be and are resolved at the initial investigatory stage; the Bar's investigation may exonerate a lawyer rather than lead to formal disciplinary proceedings. *See generally Haws*, 310 Or at 751. Full and timely responses to Bar investigatory requests are in the interests of individual Bar members, as well as the collective membership of the Bar and the public generally. *See id.* (lawyer's failure to promptly and fully respond to client's complaint to Bar burdens and delays disciplinary process in general). In the absence of any claim or demonstration by the accused that the Bar's investigatory request was not a lawful one, we agree with the trial panel that the accused's conduct in the Rubeo matter violated RPC 8.1(a)(2).[10]

### III. HERNANDEZ, SCHAUERMANN, MONTALBANO, AND OSB MATTERS

The accused was suspended from the practice of law for six months, effective October 15, 2006. *In re Paulson*, 341 Or 13, 136 P3d 1087 (2006), *cert den*, 549 US 1116 (2007) (*Paulson II*) (accused violated DR 1-102(A)(4) for conduct prejudicial to the administration of justice). The first three matters that we address in this section (Hernandez, Schauermann, and Montalbano) are complaints filed with the Bar by attorneys or judges based on the accused's representation of clients around the time of the accused's suspension. The related so-called "OSB Matters" are complaints initiated by the Bar that similarly involved the accused's representation of clients around the time of his suspension. In general, with regard to those several matters, the trial panel found that the accused violated several different disciplinary rules (which we

---

[10] The accused also asserts in his summary of facts that Bar disciplinary counsel, Hankin, visited his office while she was investigating the Brady-Aiello matter and discussed the Rubeo case with him on several occasions during those visits. He states that, through "a wink and a nod, [Hankin] advised [the accused] not to worry about the Rubeo matter." The accused provides no citations to the record, and we have found no evidence—let alone persuasive evidence—that supports his assertion. In fact, the accused's own testimony before the trial panel was that Hankin "mildly warned" him that he needed to respond better to the Bar's requests and that he might face a formal complaint if he did not.

identify and discuss at greater length below) by not protecting his client's interests in anticipation of his suspension, by practicing law while suspended, and by misrepresenting certain facts to trial courts in cases to which his clients were parties.

On review, as with the violations that we previously have discussed, the accused takes only limited issue with the trial panel's detailed findings and conclusions relevant to these several matters. What limited issue he does take—again, indirectly through his summary of facts, rather than directly through his substantive arguments—relates to the legal and disciplinary significance of his activities at certain points in time. More specifically, he disputes only whether certain actions that he took amounted to the practice of law and whether, when he made certain representations as to the legal status of his disciplinary proceeding to the trial courts presiding over several of his client's cases, his representation was legally accurate. The pertinent historical facts are, in all regards, undisputed, and the trial panel's factual findings are unchallenged.

Again, we have reviewed the record *de novo*, together with the trial panel's factual findings and conclusions on each of these matters. For present purposes, because the accused's challenge to the trial panel's conclusion is particularly narrow, we briefly summarize the facts to provide context for our discussion of the issue that the accused presents and the charges that arose out of these matters.

A. *Factual Background*

As noted, on June 8, 2006, this court issued a decision suspending the accused for six months from the practice of law, based on his violation of the disciplinary rules. *Paulson II*, 341 Or at 34. The suspension took effect on October 15, 2006.[11] Almost two months earlier (via a letter dated August 23, 2006), the Bar formally advised the accused

---

[11] In our decision, we ordered the suspension to take effect 60 days from the date of the decision. *Id.* By rule, the effective date of the decision is the date of entry of the appellate judgment. ORAP 14.05(2)(c). The accused petitioned for reconsideration, which this court denied by order on August 15, 2006. The next day, on August 16, 2006, the appellate judgment issued, making the suspension effective October 15, 2006.

that the suspension would begin October 15, 2006, and outlined his responsibilities while suspended (*e.g.*, to stop practicing law, to assist clients in the transition of their legal matters to new counsel, to take all responsible steps to avoid foreseeable prejudice to his clients' interests). On November 13, 2006, the accused asked this court to stay the judgment pending resolution of his petition for *certiorari* to the United States Supreme Court (which he filed that same date). This court denied the motion for stay on December 5, 2006, and the Supreme Court denied his petition for *certiorari* on January 8, 2007.

In each of these matters (Hernandez, Schauermann, Montalbano, and the OSB matters), the accused dated and mailed a total of five motions—each entitled "Motion to postpone trial/hearing and to abate"—to the circuit court in five separate actions involving several of the accused's clients. The date on which the accused did so was October 15, 2006, the same date on which his suspension became effective (which was a Sunday). The motions were virtually identical in substance. Each represented that a postponement and abatement in the case was necessary because *"In re Paulson,* Supreme Court Case No. S52465" was "on appeal." For some of those matters, the record is silent as to whether the accused consulted his client before filing the motion. In others, the clients expressly testified that the accused did not consult with them.

The accused also took other actions in connection with some of those proceedings, which included:

- On August 2, 2006, after this court's decision ordering his suspension, but before the effective date of the suspension, the accused filed a complaint initiating an action on a client's behalf in Washington County.

- On October 15, 2006, the effective date of his suspension, the accused, without referring to his suspension, filed by mail a "Plaintiff's First Amended Complaint" in a case in which a motion to dismiss was pending.

- Before his suspension, on dates in September and October 2006, the accused met with opposing counsel to discuss settlement of a child custody case (the "Loucks"

case) in which the accused's client, the child's father, was alleging that the child was being exposed to abuse in the child's mother's home. Trial in the case was scheduled for October 19, 2006. The accused did not mention his upcoming suspension to opposing counsel. One day before his suspension, on October 14, 2006, the accused wrote opposing counsel, further discussing settlement and some remaining issues between the parties. On October 15, 2006, the accused dated and mailed to the court a motion to withdraw from the Loucks case. On October 16, 2006—one day after the accused's suspension became effective—opposing counsel responded in writing to the accused's settlement letter. That same day, the accused and opposing counsel discussed settlement. When opposing counsel later prepared and faxed a stipulated judgment to the accused, opposing counsel received no response and was unable to reach the accused, despite hourly attempts to call him.

Finally, in connection with several of these matters, the accused failed to take steps to notify his clients of his prospective suspended status and of his suspension once it began; he filed significant motions in their cases without their knowledge; and, in the Loucks child custody matter, the accused withdrew from the client's representation without the client's knowledge, and the client did not learn until the day before trial that the accused would not be representing him. The client in that case had to fend for himself in obtaining new counsel, and the accused was slow to release his file in the case to the client's new attorney. Resolution of the Loucks child custody matter was delayed by at least a month as a result.

In each of these matters, when the Bar began its investigation into the possible misconduct on the accused's part, the Bar wrote letters to the accused asking for information in connection with the complaint and gave the accused nearly two months in which to provide that information. In each instance, the accused did not respond. The Bar then sent the accused a reminder letter. Approximately a week after that, the accused responded, sending separate letters in each matter. Each letter said only:

> "Thank you for yours of January 3, 2007. Please see BR 1.9, BR 2.5, BR 6.3 and ORCP 10.

> "Thank you for your interest and devotion to duty."[12]

The accused never responded further to the Bar's investigatory inquiries in these matters.

## B. *The Violations*

As already noted, the accused raises only narrow issues in connection with the violations that the trial panel found based on his conduct in these matters. As a result, several of the violations are, in effect, unchallenged by the accused. We discuss those violations first, and somewhat summarily. We then turn to the violations that the accused's challenges implicate.

### 1. *RPC 1.16(d)*

■ RPC 1.16(d) requires a lawyer to take all reasonable steps to protect a client's interests and prevent prejudice to the client upon termination of representation.[13] The trial panel found that the accused violated that rule in connection with his handling of the Loucks child custody case on and around the date that his suspension began.

In particular, the trial panel observed that the custody case was set for trial only a few days after the accused's suspension was to begin. On the first day of his suspension, the accused prepared and mailed both a motion to postpone and abate the case and a motion to withdraw as counsel for

---

[12] BR 1.9 is a general provision regarding the computation of time periods under the rules (Saturday and holiday exclusions); BR 2.5 is a rule regarding intake of complaints by the Client Assistance Office; BR 6.3 provides, in part, that the rules do not preclude a suspended lawyer from providing information to a succeeding attorney and that the suspended lawyer "shall" provide the information "on request"; and ORCP 10 provides for the computation of time for any period of time prescribed or allowed by the Rules of Civil Procedure. The inference apparently to be drawn from the accused's cryptic message was that the accused's suspension had not begun until Monday, October 16, 2006. The accused, to the extent that he ever advanced that position, no longer does.

[13] RPC 1.16(d) provides, in part:

"Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment * * *."

his client. The accused did not contact or otherwise communicate with his client about his status. Neither did the accused inform his client of the motions that he had mailed to the court only days before trial. Instead, the accused basically left his client to fend for himself in the matter. The day before trial, the client found out from opposing counsel that the accused was suspended; the accused's client then had to scramble to find alternative representation. Once the client found new counsel, the accused was slow to turn over his file to either his client or the new attorney.

The accused does not challenge either the trial panel's findings or its conclusion that the accused violated RPC 1.16(d) in his handling of the Loucks case. Based on our review of the record and the trial panel's determination, we agree that the accused violated RPC 1.16(d). *See In re Biggs*, 318 Or 281, 864 P2d 1310 (1994) (lawyer abruptly left practice without notifying clients or finding other lawyers for his clients); *In re Devers*, 317 Or 261, 855 P2d 617 (1993) (lawyer failed to return client's file).

2. *RPC 8.1(a)(2)*

RPC 8.1(a)(2), as we discussed previously in connection with the Brady-Aiello matter, prohibits a lawyer from "knowingly fail[ing] to respond to a lawful demand for information" in a disciplinary investigation. The evidence is undisputed that, as the trial panel found, the accused failed to respond to the Bar's initial request for information in each of these matters. In each instance, after the accused's initial failure, the Bar sent out a reminder letter. When the accused finally responded, he did so with a nonresponsive sentence citing various Bar Rules and ORCP 10. The trial panel found that the accused's initial failure to respond and his later inadequate response violated RPC 8.1(a)(2). The accused raises no argument that calls the trial panel's findings or conclusions on that violation into question. We, too, find that the accused violated RPC 8.1(a)(2) in these matters.

3. *RPC 1.16(a)(1) and RPC 5.5*

The Bar alleged several causes of complaint based on what the Bar asserted was the accused's practice of law at a time when he was suspended. The trial panel found that the

Bar had proved violations in each instance. In particular, the trial panel found that the accused violated RPC 5.5 (unauthorized practice of law) and RPC 1.16(a)(1) (failure to withdraw from representation when representation will result in violation of RPC or other law).

Those charges are among the few that the accused disputes. In doing so, he does not dispute that he engaged in the actions and inactions found by the trial panel. Neither does he dispute that he did so on the dates identified in the trial panel's findings. Instead, he disputes only whether his conduct qualified as the practice of law. In particular (and, again, in his summary of facts and not in his substantive argument), the accused asserts summarily, "The date something is filed has nothing to do with someone practicing law" and "[c]lerks file things, lawyers don't." He further asserts that the "law is clear on that point[,]" although he cites nothing in support of his proposition.

The accused was suspended as of October 15, 2006. The trial panel found that the accused engaged in conduct that he "was not authorized to engage in * * * on October 15, 2006." In particular, at the disciplinary hearing, the accused acknowledged that he prepared the various motions to postpone and abate in these matters on that same date (a Sunday). Consistently with that acknowledgment, the motions in fact were dated for that date and signed by the accused. They also were mailed that date, either by the accused or by someone acting at his direction. By preparing and mailing them, the accused performed all the acts necessary to cause the motions to be delivered to the court clerk, which is what constitutes "filing." *See* ORCP 9 E (providing, in part, that "the filing of pleadings and other documents with the court * * * shall be made by filing them with the clerk of the court"). There is no merit to the accused's argument that, by preparing, signing, and mailing the motions to the circuit courts in each of the matters on the first date of his suspension, he did not engage in the practice of law. Based on our review of the record and the trial panel's determination, we agree that the accused violated RPC 5.5.

RPC 1.16(a)(1) requires a lawyer to withdraw from representation if the representation will result in a violation

of the rules or other law. As noted, the accused was suspended as of October 15, 2006. Consequently, as the trial panel correctly observed, "any efforts by the Accused to practice law on or after that date was in violation of the court's order." The trial panel found that the accused, although suspended from the practice of law on October 15, 2006, failed to withdraw from representing his clients in the Hernandez, Schauermann, Montalbano, and OSB matters other than Loucks. He instead continued representation of the clients in those matters, which constituted the unauthorized practice of law in violation of both the court's order and RPC 5.5. Accordingly, we conclude, as the trial panel did, that the accused's failure to withdraw from representation violated RPC 1.16(a)(1).

### 4. *RPC 3.3(a)(1), RPC 8.4(a)(3), and RPC 8.4(a)(4)*

RPC 3.3(a)(1) prohibits a lawyer from making a false statement to a tribunal. RPC 8.4(a)(3) prohibits a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness to practice law. RPC 8.4(a)(4), as earlier discussed in connection with the Brady-Aiello matter, prohibits a lawyer from engaging in conduct that is prejudicial to the administration of justice. The Bar alleged, and the trial panel found, that the accused violated each of those rules by representing in his several motions to abate and postpone, and in his declarations in support of those motions, that his disciplinary proceeding was "on appeal" as of October 15, 2006.[14] Without any development of the point, the accused merely states in his summary of facts that his representation was true.

As the trial panel concluded, however, the accused's sworn representation that his disciplinary case was "on appeal" was patently not true. The procedural facts pertinent to the issue are straightforward. This court had issued its decision on June 8, 2006. The accused timely petitioned for reconsideration, and this court denied the petition on August 15, 2006. The appellate judgment issued the next day. As a result, the accused's suspension went into effect on

---

[14] The accused supported each motion with a "Declaration of Lauren Paulson" in which the accused attested, under penalty of perjury, to the truth of the representations about the status of his disciplinary matter.

October 15, 2006. On that same date, the accused filed the motions representing that his disciplinary matter was "on appeal." That was not so. The accused, as of that date, had pursued to conclusion the only appellate remedy available to him as a matter of right—*viz.*, review by this court. His only remaining remedies were discretionary ones, and he had taken no action to pursue any of them. To be sure, the accused evidently *intended* to seek *discretionary* review by the United States Supreme Court—as opposed to appeal as a matter of right, which was not available to him.[15] He had not done so, however. And the accused, we presume, likewise *intended* to apply for a stay by this court, as he later did on November 13, 2006, without success. When the accused represented in his motions that his disciplinary case was "on appeal," however, no appellate proceeding was pending. This court had issued its appellate decision several months before; the appellate judgment had issued; the Bar had written the accused advising him when his suspension would take effect; and the suspension had become effective on the very day that the accused prepared, dated, and signed the motions containing the representation.

As the trial panel concluded, the accused falsely represented in his several motions to abate and postpone that his disciplinary matter was on appeal. The trial panel further concluded that the accused knew that the representations were false. The trial panel explained:

"The Accused clarified during trial that what he meant by this statement was that the case was still pending before the Oregon Supreme Court. He acknowledged that as of October 15, 2006, the Writ of Certiorari to the US Supreme Court was not yet in the works, and the motion to stay his suspension filed with the Oregon Supreme Court was not filed until almost a month after the [ ] October 15 motions were prepared and filed. The declarations to the various trial courts regarding the status of *Paulson II* were false and the Accused knew they were false at the time he made

---

[15] As the trial panel specifically noted, the accused "clarified during trial that what he meant by [the statement that the matter was on appeal] was that the case was still pending before the Oregon Supreme Court." The accused also acknowledged that his petition for certiorari was "not yet in the works" and that his motion to this court to stay the suspension was not filed until a month after he had made the representations that his disciplinary matter was on appeal.

them. Each of the 'declarations' filed by the Accused include the statement 'I hereby declare that the above statements are based on personal knowledge, are true to the best of my knowledge and belief, and I understand they are made for use as evidence in Court and are subject to penalty for perjury.' Thus, it would seem that the Accused was well aware of the importance of telling the truth to these trial courts."

(Transcript citations omitted.)

The trial panel further found that the accused's false representations in his motions to postpone and abate were "designed to mislead." In that regard, the trial panel specially noted that, based on its observations of the accused throughout the disciplinary hearing before the trial panel, the accused was someone who "chooses his words carefully to convey an intended meaning." That demeanor-based observation—that the accused deliberately crafts his words for an intended effect—led the trial panel to expressly find that, "[i]n the declarations at issue here, he chose words to convey a meaning that was not true. We believe he did this deliberately, to add strength to his motion."[16] We defer to that express, credibility-based determination on the trial panel's part, which, in all events, is confirmed by our *de novo* review of the record. *See generally Fitzhenry*, 343 Or at 103 (discussing when court defers to credibility-based findings of disciplinary trial panel).

The trial panel concluded that the accused, by deliberately making a false statement in his several circuit court motions, violated each of several rules. We agree. We find that the accused's intentional conduct in making the false representations in his several circuit court motions violated

---

[16] The trial panel discussed not only the accused's statement in his motions that his disciplinary matter was "on appeal," but also his statement that he was "requesting a stay" of his disciplinary matter so that he could continue his representation in the various matters in which he filed the motions. The trial panel observed that, given the accused's inclination to craft his words carefully, a statement that " 'I am requesting a stay' is quite clearly not the same as 'I intend to request a stay in [my disciplinary proceeding].' " The trial panel did not appear to view the accused's representation about the stay as an independent violation of the rules, so much as it was context and part of the representation that the disciplinary matter was "on appeal." We agree. We note, as further context, that the accused cited his disciplinary proceeding only as *"In re Paulson,* Supreme Court Case No. S52465," which suggested a pending appeal. He did not cite the reported decision announcing the resolution of the appeal, as he readily could have.

RPC 3.3(a)(1) (knowingly making a false statement of law or fact to a tribunal), RPC 8.4(a)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation that adversely reflects on the lawyer's fitness to practice law), and RPC 8.4(a)(4) (conduct prejudicial to the administration of justice).

## IV. PROCEDURAL ISSUES
## AND AFFIRMATIVE DEFENSES

As we earlier described, the accused's substantive arguments in his brief do not challenge the trial panel's factual findings or conclusions as to the rules that the trial panel found the accused to have violated. Instead, the accused raises only procedural issues that he has styled as "affirmative defenses"—defenses that, in his view, require dismissal of the disciplinary proceeding in its entirety.

We do not discuss all the issues that the accused raises and argues. Some repeat arguments that we have previously rejected in our review of the accused's prior disciplinary proceedings.[17] Others raise matters that simply are not relevant "defenses" to the disciplinary violations at issue in this proceeding.[18] Still others raise issues that were not

---

[17] *See Paulson III*, 341 Or at 546 (rejecting the accused's claim that this court does not exercise independent judgment in appointing members of the Disciplinary Board and that disciplinary counsel plays an inappropriate role in advising the Board; concluding that, in all events, given the court's *de novo* review of disciplinary cases, the defect that the accused perceives has no effect on the fairness or the legitimacy of this court's resolution of a disciplinary matter); *id.* at 546-47 (rejecting the accused's argument that BR 18.6, which resulted in his suspension from the Board of Governors during the pendency of his formal disciplinary charges, is an unconstitutional Bill of Attainder); *In re Paulson*, 335 Or 436, 439, 71 P3d 60 (2003) (*Paulson I*) (rejecting accused's argument that trial panel's failure to file opinion within the timelines identified in the Bar's rules requires automatic dismissal of disciplinary charges).

[18] The accused argues extensively that the trial judges who presided over the circuit court proceedings involved in settling the Brown estate and distributing the assets were biased against him. After entry of the rulings that the accused asserts reflected judicial bias (*e.g.*, the order removing the accused as trustee and personal representative; the order requiring him to repay fees that he had collected from the estate), the accused petitioned this court for a writ of mandamus based on his claim of judicial bias. This court denied that petition. The accused renews his arguments, but they are irrelevant to the fairness of this disciplinary proceeding and to whether the accused committed the violations as alleged.

In something of the same vein, the accused renews arguments about perceived improprieties in his prior disciplinary proceedings, some of which he previously argued to this court on review in those prior proceedings, and some of which may be new, but have no bearing on either the violations or the sanction at stake in this

raised before the trial panel and that are unpreserved and undeveloped for our review.[19]

As to those arguments that do warrant discussion, the accused presents them all pursuant to a single question presented: "Is the Oregon State Bar disciplinary system unconstitutional because it denies Oregon State Bar members free speech, due process and equal protection of the laws?" Although some of the accused's arguments appear to raise claims of systemic unconstitutionality, others are claims of procedural irregularities that are specific to this case. We begin with those claims. We then turn to the accused's apparent claims of systemic unconstitutionality.

## A. *Panel Opinion Signed by Only Two Panel Members*

■ When the trial panel filed its opinion with the Disciplinary Board, the panel chair did so with a cover letter and an initial footnote in the opinion itself acknowledging that the opinion had been signed by only two of the three members of the trial panel. The letter explained that the member who did not sign the opinion (Dr. Kosokoff, the public member of the panel) had "fully participated in the trial of the case, the deliberations and ultimate decision of the trial panel, and also provided comment and input on the initial draft of the opinion." Because of Kosokoff's travel plans, which required him to be out of the country, the date for filing the opinion had been extended to permit him to review and comment on the opinion in its final form after his return. While traveling, however, Kosokoff suffered a stroke and was hospitalized out of state. He could not communicate verbally and was unavailable to review the final written opinion and to sign it. The chair ended the letter stating, "Because

case (*e.g.*, that this court, on *de novo* review, should not be able to increase the period of an accused's suspension). Those and similar arguments advanced by the accused are not pertinent to the issues in this case.

[19] For example, the accused summarily argues that, as a result of this disciplinary proceeding, he "has been injured and has been denied a right to a jury trial by his peers," citing Article I, section 10 (right to remedy for an injury), and Article I, section 17 (right to jury trial in civil cases), of the Oregon Constitution. The accused did not raise those arguments before the trial panel. Even if he had, he does not adequately develop them on review. We therefore do not consider those arguments.

Dr. Kosokoff actively participated in the trial and decision process, and to avoid further delay in the case, I have elected to proceed with filing the opinion without Dr. Kosokoff's signature."

BR 2.4(a) requires a trial panel in a disciplinary proceeding to consist of "2 attorneys and 1 public member." BR 2.4(i)(2)(a) provides, in part, that "the trial panel shall render a written opinion signed by the concurring members of the trial panel." That rule also provides that a dissenting member shall note his or her dissent, and may file a dissenting opinion and attach it to the majority opinion of the trial panel.

Relying on that requirement, the accused argues that the lack of Kosokoff's signature on the opinion requires a mistrial. The accused urges that "[n]o one knows if [Kosokoff] was ill during the proceedings" and now suggests, based on the accused's observations, that Kosokoff may not have been well at that time. The accused maintains that the trial panel's understanding of how Kosokoff voted was a product of "inadmissible hearsay."[20] In the accused's view, the procedural irregularity of having only two signatures on the opinion *per se* requires a mistrial.

Although the lack of Kosokoff's signature on the opinion may be a procedural irregularity, it is not one that requires a mistrial. Nothing in the Bar's rules expressly requires that all three panel members actually *sign* the panel opinion. Rather, only those concurring must do so. Here, the chair and one other member of the trial panel concurring in the decision both signed the opinion. That is enough to make the opinion the official opinion of the panel. If one panel member were to insist on abstaining from casting a vote,

---

[20] The accused presumably bases that assertion on the fact that the chair, in her letter accompanying the opinion, noted that Kosokoff's wife had contacted the chair about Kosokoff's illness and had advised the chair that, before leaving on his travels, Kosokoff had discussed the draft opinion with his wife and told her that he agreed with the decision to disbar the accused. That representation was, to be sure, hearsay, insofar as the truth of Kosokoff's statements to his wife are concerned. But the chair knew firsthand how Kosokoff had voted on the ultimate decision and she was a witness to his participation in the panel's deliberations. The chair's reference to the wife's statements appear to have been offered only as added, not independent, assurance of Kosokoff's position.

nothing in the rule prevents two concurring members from still rendering an opinion and giving it effect by signing it. At best for the accused, that was the consequence of Kosokoff's inability to sign the panel opinion here—he did not join in the opinion, and neither did he dissent. He effectively is in the position of an abstaining panel member.

We might reach a different conclusion if the irregularity were shown to have prejudiced the accused. But here, there is no prejudice. The accused's belated assertion that Kosokoff may not have been well at the time of the hearing is unsupported. Our *de novo* review of the record confirms his active participation in the hearing (*e.g.*, through the questions he asked both of witnesses and the accused). And, significantly, the accused raised no claim during the proceedings that Kosokoff seemed ill or was otherwise not participating. Neither did the accused do anything to raise such an assertion when the trial panel chair, upon filing the opinion, noted Kosokoff's participation in the hearing and the deliberations on the draft opinion, while explaining the circumstances that prevented Kosokoff from participating in review of the final opinion and signing it. Under the circumstances, there is no reason to believe that Kosokoff's post-hearing illness limited the development of the record or the deliberations of the trial panel, or that it in any other way deprived the accused of a fundamentally fair proceeding. *See In re Hendrick*, 346 Or 98, 107-08, 208 P3d 488 (2009) (*de novo* review cannot cure a procedural error that might affect the development of the record). The accused is not entitled to a new disciplinary hearing on this ground.

B. *Joinder of Complaints*

The accused asserts that the complaints arising out of the several matters involved in this case were improperly consolidated into one disciplinary proceeding because the several matters have "no nexus in either law or fact." BR 4.1(d) specifically vests the State Professional Responsibility Board (SPRB) with the authority to consolidate two or more causes of complaint against the same lawyer. Implicit in the rule is the recognition that the fact that the charges are

against the same lawyer provides a sufficient "nexus" for joinder of the separate causes of complaint. The rule is analogous to the rule that governs permissive joinder in civil proceedings in circuit court. *See* ORCP 24 A (plaintiff may join in single complaint as many claims as plaintiff has against an opposing party). The accused's reliance on the standards for consolidating charges in criminal cases does not aid him—disciplinary proceedings are governed by the Bar's rules, not the statutes that apply to criminal prosecutions. *See generally In re Wyllie*, 326 Or 622, 626, 956 P2d 951 (1998) (bar disciplinary proceedings are not criminal proceedings). To whatever extent the accused may maintain that general federal principles of "due process" compel some different test for joinder of complaints in lawyer disciplinary matters, the accused has made no developed or legally supported argument in that regard. The accused's challenge to the joinder of the several complaints against him provides no ground for relief.[21]

---

[21] The accused also suggests that consolidation of the matters left him unprepared to defend himself. He relies on the fact that the Bar's first complaint pertained to only the Brady-Aiello and Rubeo matters, which were scheduled for hearing on April 25, 2007. Then, on March 8, 2007, the Bar amended its complaint to include allegations arising from the other matters.

The accused did not claim to the trial panel that he was not prepared to defend himself on the amended charges, however. To the contrary, the record demonstrates just the opposite. The trial panel chair permitted the Bar to amend its complaint after finding that the accused appeared "to have had notice and knowledge of the Bar's allegations some time ago and the new allegations appear to stem primarily from action taken by [the accused] on the same date (October 16, 2006)." The chair conditioned her ruling, however, stating that she would allow the Bar to go forward on the amended complaint only "so long as all necessary (and reasonable) discovery can be completed" before the hearing consistently with Bar rules. At the outset of the hearing, the accused continued to press his request to depose the judges who ruled in the Brady-Aiello matter, but he made no assertion that he did not receive discovery on the new matters in the amended complaint or that he otherwise had not had sufficient time to prepare a defense on those matters. Ultimately, there was a several week break between the first two days of the hearing (April 27 and April 28, 2007), and the final day (June 21, 2007). On the last day of the hearing, the Bar completed its case, and the accused presented his evidence. The accused advised the trial panel that, with respect to the additional matters in the amended complaint, "I don't know of anything I wouldn't be willing to stipulate to. * * * I'm probably willing to stipulate to most of what the [B]ar plans to put on." Counsel for the Bar and the accused then conferred off the record, and both sides stipulated to the evidence on those matters (*i.e.*, the Bar's investigative reports). In short, the record provides no support for the accused's assertion—raised for the first time on review—that he needed additional time to meet the Bar's evidence on the new matters raised in the amended complaint.

## C. *Discovery*

 The accused asserts that the trial panel improperly denied him discovery by denying his request to depose judges who had ruled in the underlying circuit court proceedings in the Brady-Aiello matter and who, according to the accused, were biased against him. In response to the accused's attempt to depose those judges, the Department of Justice moved for a protective order. The trial panel chair granted the motion after concluding that the accused wanted to depose the judges on matters collateral to the disciplinary charges that he was facing. At various times during the hearing, the subject came up again, with the accused effectively renewing his request to depose those judges. The trial panel chair considered those requests, but each time concluded, as she had earlier, before the hearing, that the matters into which the accused wanted to inquire would not be sufficiently relevant to the issues in this disciplinary proceeding.

Under BR 4.5(b)(1), an accused lawyer in a disciplinary proceeding is entitled to seek discovery through requests for admission, production of documents, and the use of depositions. The accused's right to discovery, however, is not absolute. The purpose of discovery in disciplinary proceedings is "to promote identification of issues and a prompt and fair hearing on the charges." BR 4.5(a). The trial panel chair, who is charged with ruling on discovery motions, is vested with discretion in that regard and may "impose such terms or limitations on the exercise of discovery as may appear necessary to prevent undue delay or expense in bringing the matter to hearing and to promote the interests of justice." BR 4.5(d).

The accused makes only a categorical argument that he was entitled to depose the trial judges in question. He does not examine the particular arguments that he made to the trial panel in support of his efforts to depose those trial judges; he does not explain, in any concrete or focused way, how the depositions of those judges would have been relevant to the charges against him in this proceeding; and he makes no effort to demonstrate that the denial of his requests was an abuse of discretion. We find no error by the trial panel chair in this regard.

## D. *Vindictive / Retaliatory Disciplinary Proceeding*

In *In re Paulson*, 341 Or 542, 545, 145 P3d 171 (2006), *cert den*, 549 US 1304 (2007) (*Paulson III*), the accused defended against the disciplinary complaint brought against him, arguing, in part, that the disciplinary counsel for the Bar had filed the complaint for vindictive and retaliatory motives. This court rejected his arguments, because the accused had not substantiated his claim that the Bar had initiated the disciplinary proceeding for an impermissible reason. *Id.*

In this proceeding, the accused attempted to make the record that he failed to make in *Paulson III*. In particular, the accused called the Bar's Disciplinary Counsel, Jeffrey Sapiro, and its then-Executive Director, Karen Garst, as witnesses. The accused also put in a range of documentary exhibits, such as statistical studies of the Bar membership examining the extent to which the general membership perceives the disciplinary process as fair or biased (and if biased, on what basis), and letters from other persons who had been subject to the disciplinary process in the past and who thought that their particular proceedings had not been fair. In attempting to show that the disciplinary proceeding against him was impermissibly motivated, the accused also relied on the timing of earlier disciplinary proceedings against him, which he asserted coincided with activities in which he had engaged that had caused Sapiro and Garst to be vindictive towards him.

The trial panel—which the accused does not challenge as biased in any way—took his claims seriously and addressed them expressly. The trial panel accurately captured the essence of the theme that pervades the accused's arguments in this case:

> "These defenses are alleged in a manner suggesting a common theme—the Bar has treated the Accused differently than other members of the Bar accused of wrongdoing and has done so because the Accused objected to the manner in which the Bar conducted its business; had objected to the disciplinary process as part of a disciplinary system task force some years ago; had been openly critical of Jeff Sapiro

and his office; had raised issues of improper ex parte conduct about his case(s) between the Board of Governors and the Supreme Court; and had complained about delay and retaliation against him. In short, that the Accused's assertion of his rights over the past several years has resulted in such animosity towards him that the claims of misconduct by the disciplinary counsel's office have been and are spurious and raised solely to retaliate and silence the Accused."

The trial panel found no persuasive evidence that either Sapiro or Garst had a vindictive or retaliatory motive in taking any action connected with the disciplinary proceedings against the accused. To the contrary, the trial panel found expressly:

"[T]he Accused examined both Karen Garst and Jeffrey Sapiro. The Trial Panel listened to that testimony carefully. The Accused argues the timing of all that has happened to him is sufficient evidence of animosity. While there are inferences that can be drawn in favor of the allegations of the Accused, they do not arise to a level that satisfies the Accused's burden of proof. While Sapiro admitted he was not happy about the federal court civil suit the Accused filed against him and other Bar leaders, there is no convincing evidence the allegations raised in that case, the defenses filed in *Paulson II*, or those in the case at bar have affected his judgment. In short, the panel finds that the Accused has taken the process very personally while Garst and Sapiro have taken it professionally."

Later, in the discussion and conclusion section of the trial panel's opinion, the trial panel further addressed the accused's claim that the disciplinary proceedings against him were impermissibly motivated:

"We have discussed [the accused's prosecutorial misconduct defenses] above, and are unable to find prosecutorial misconduct in this case. We carefully reviewed the documents in this case, including those offered by the Accused; observed the demeanor and actions of disciplinary counsel and trial counsel for the Bar; and observed the testimony of both Karen Garst and Jeff Sapiro. While the Accused may believe there was a vendetta against him by the Bar, it has not been proven by any reasonable standard. It is true that the Accused has leveled a long series of charges against the Bar over a period of years and that those assertions have

been emotional for all concerned. Throughout this time, however, the panel must conclude officials of the Bar seem to have acted properly. That said, the panel would feel differently if the prior disciplinary cases against the Accused (as well as the charges pending here) had been determined to be without merit. Even at that, however, we are not certain that facts that might amount to a tort claim for malicious prosecution are a viable defense in an unrelated disciplinary case."

The trial panel's rejection of the accused's claims of vindictive and retaliatory "prosecution" turned significantly on the panel's credibility assessments of both the accused and the Bar staff. We appropriately defer to those assessments. The accused's theory of vindictive and conspiratorial motivation for the proceedings against him collapses with the trial panel's finding, which we make as well, that neither Sapiro nor Garst took any action that led to the disciplinary proceedings out of personal animus against the accused.[22] In addition, as the trial panel observed, and as this opinion earlier concludes based on our *de novo* review, the complaints against the accused all have proved to be well-founded. Bar staff would have been remiss in meeting their responsibilities had they not investigated those complaints. Likewise, they would have been remiss had they not pursued the additional disciplinary violations that they discovered in the course of their investigations (*viz.*, the violations related to the accused's unauthorized practice of law when his suspension began). Having reviewed all the evidence that bears on the accused's claim that the disciplinary proceedings against

---

[22] Neither does the law bear out certain of the accused's claims. For example, the accused appears to contend that Sapiro had a *per se* conflict of interest that required Sapiro to have no contact at all with this disciplinary matter. The accused so asserts because Sapiro was the defendant in a federal claim that the accused filed against him. Relying on various cases from other jurisdictions, the accused asserts that his action against Sapiro created a conflict of interest that precludes any disciplinary proceeding from going forward as long as Sapiro holds a position that entails general oversight of disciplinary investigations and complaints. Suffice it to say that we have reviewed each of the cases that the accused cites; they are all highly fact-bound and do not involve facts sufficiently analogous to those on which the accused relies to merit further discussion. *See, e.g., City of Mapel Heights v. Redi Car Wash*, 51 Ohio App 3d 60, 554 NE 2d 929 (1988) (detailing extensive evidence of prosecutor's personal animosity against defendants in criminal case, including lawsuit brought *by* prosecutor against defendants; trial court disqualified prosecutor from handling criminal case against defendants).

him had been brought for impermissible motives, we conclude that the evidence disproves the accused's defense.[23] Consequently, just as the trial panel did not need to decide when a claim of vindictive or retaliatory "prosecution" in a disciplinary proceeding will provide a valid defense to proven disciplinary violations, so, too, do we not need to decide that question.

E. *Delay*

The accused argues, as he has in past disciplinary proceedings, that the trial panel's delay in issuing its opinion deprived him of due process. In *In re Paulson*, 335 Or 436, 439, 71 P3d 60 (2003) (*Paulson I*), this court held that a disciplinary trial panel's failure to comply with the timelines identified in the Bar rules for issuing opinions is not an automatic ground for dismissal of the complaint against a lawyer charged with misconduct. Rather, the accused must show that the delay prejudiced his ability to receive a fair hearing. As in *Paulson I*, the accused has not made—or attempted to make, for that matter—the required showing. He is not entitled to relief on that ground.

F. *Other Claims of Unconstitutionality*

The accused, in scattershot fashion, makes a variety of arguments in support of his position that the Oregon State Bar disciplinary system deprives its membership in general of equal protection, due process, and free speech. Many of those arguments—and particularly the accused's argument that the system is "rigged"—reiterate points that the accused makes in support of his claim that the disciplinary proceedings against him were motivated by vindictiveness or retaliation. We do not address those arguments separately; they are answered by our disposition of his claim of vindictiveness

---

[23] The accused attempts to take the trial panel to task for placing the burden on him to prove what he presented as his "affirmative defenses." According to the accused, his obligation was only to make out a "prima facie" case that Bar staff harbored impermissible motives in pursuing the disciplinary complaints at issue; the burden of proof then shifted to the Bar to disprove his claim. We need not decide the question of who has the burden of proof on an affirmative defense of this kind in a disciplinary proceeding. The case comes to this court on a fully developed record. The question for this court on *de novo* review, as it was for the panel at the conclusion of the hearing, is what conclusions to draw from the sum of the evidence adduced by both parties.

and retaliation. We address only two remaining claims, neither of which merit extended discussion.

■ First, the accused asserts that the free speech rights of lawyers charged with disciplinary rule violations are violated by Oregon State Bar Bylaw 18.103, which prevents a lawyer who is subject to a formal disciplinary proceeding from communicating with the Board of Governors and Bar employees, agents, or representatives "regarding the matter." Once a formal disciplinary proceeding is underway, the Bar effectively is "represented" in the matter by disciplinary counsel. The lawyer who is the subject of the proceeding is therefore limited to communicating "on the merits of the matter" with "Disciplinary Counsel's office and with appointed counsel for the Bar[.]" The Bylaw thus effectively implements RPC 4.2, which restricts lawyers from communicating on the *subject* of the representation with a person that the lawyer knows to be represented by a lawyer.

The accused's argument presents a facial challenge to the validity of Bylaw 18.103 that has no bearing on any issue in this case.[24] The accused was not charged with violating Bylaw 18.103 or RPC 4.2. If he had been alleged to have violated that rule, his argument might present a legitimate defense. *See generally State v. Spencer*, 289 Or 225, 228, 611 P2d 1147 (1980) (law that facially violates the state constitutional free speech protection is void and unenforceable, regardless of whether particular conduct involved was itself protected). But, as it stands, the accused's argument that Bylaw 18.102 violates constitutional free speech guarantees is purely collateral to the issues in this case. Whatever the merits of the accused's argument, it provides no ground on which the accused is entitled to avoid the consequences of the particular disciplinary violations involved in this proceeding.[25]

---

[24] The accused has not made any form of an "as-applied" challenge in this case. Thus, he has not claimed or identified any communication that he desired to direct to the Board of Governors or other Bar officials, but was prevented from communicating. Neither has he attempted to demonstrate that any such restriction in this case actually affected the fairness of this particular disciplinary proceeding.

[25] Neither has the accused adequately developed his argument. He does not ground his argument in either the state or federal constitutional free speech provisions, and he does not identify how his free speech is meaningfully restricted if he is required to communicate on a formal disciplinary matter to Bar officials and

The second, and final, argument that we address is the accused's claim that the disciplinary process violates due process and equal protection because lawyers accused of rule violations are not given adequate access to "voluntary" counsel. The accused's argument in that regard is a particularly narrow one. He does not assert a constitutional right to *appointed* counsel. Nor could he; he has not claimed that he is indigent, that he is similarly situated to others who receive appointed counsel, or that our precedent establishing that there is no general entitlement to appointed counsel in disciplinary proceedings is wrongly decided. *See In re Harris*, 334 Or 353, 363-64, 49 P3d 778 (2002) (federal due process principles do not require appointment of counsel for an indigent lawyer charged with violating disciplinary rules). The accused relies instead on the fact that members of the Bar volunteer to serve as Bar counsel in disciplinary matters "free of charge." Therefore, according to the accused, the Bar must provide the accused with access to volunteer counsel as well.

Whatever its constitutional merits, the accused's argument presents a nonissue. The accused's own questioning of Bar staff in this case established that, in fact, the Bar annually solicits its membership and collects the names of lawyers who will voluntarily represent accused lawyers in disciplinary cases. When a formal complaint alleging a violation is filed against a lawyer, that lawyer is provided with a list of those volunteers. The accused lawyer is then free to contact a lawyer on that list in an effort to arrange for voluntary representation. In this case, the accused has not claimed that a list of volunteer lawyers was not provided to him. Neither has he claimed that he tried unsuccessfully to avail himself of representation through that process. His argument does not even acknowledge the existence of that voluntary program. Given the record before us, and the limitations of the argument that the accused has presented, we conclude that his challenge on this ground is without merit.

others *through* the lawyer that represents the Bar, rather than directly. Even if the accused's argument were pertinent to some issue in this case—which it is not—it is not sufficiently developed for us to consider it further.

## V. SANCTION

■ Having found that the accused violated the disciplinary rules charged and having rejected the accused's "affirmative defenses," the court must determine the appropriate sanction. The trial panel disbarred the accused. On review, the accused does not challenge the trial panel's sanction. We have nevertheless reviewed the trial panel's conclusions with regard to the sanction and, as we explain below, we agree that disbarment is appropriate in this case.

■ ■ The purpose of lawyer discipline is not to punish a lawyer that has failed to follow those rules. *See In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989) (so observing under former disciplinary rules). Rather, the purpose is to "protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." American Bar Association's *Standards for Imposing Lawyer Sanctions* § 1.1, 7 (1991) (amended 1992) (ABA Standards). In determining an appropriate sanction for a lawyer's violations of the rules, we follow the analytical framework that this court has set out in past cases. Under that framework, we determine an initial presumptive sanction based on (1) the ethical duty violated; (2) the lawyer's mental state; and (3) the actual or potential injury caused. *See, e.g.*, *In re Jaffee*, 331 Or 398, 408, 15 P3d 533 (2000) (articulating methodology). We then adjust that presumptive sanction based on a fourth factor—the presence of aggravating or mitigating circumstances. *Id.* at 408-09. Finally, we consider whether the sanction that we arrive at through that analysis is consistent with Oregon case law. *Id.* at 409.

### A. *Duty*

The accused has violated multiple rules in this matter, several of them multiple times. The violations breached the accused's duties to his clients, to the legal system, to the profession, and to the public. *See, e.g.*, *In re Jaffee*, 331 Or at 409 (conduct prejudicial to administration of justice violates duties to public and to legal system, as well as to clients; public has a right to expect lawyers to live up to the highest standards of honesty and integrity; dishonest conduct violates duties to public); *In re Stauffer*, 327 Or 44, 66, 956 P2d 967

(1998) (collection of excessive or improper fees violated duties to the profession); *In re Jones*, 312 Or 611, 617, 825 P2d 1365 (1992) (failure to refrain from practice of law consistently with disciplinary order violated duty owed to legal system; failure to cooperate with Bar investigation violates duty to legal profession).

## B. *Mental State*

The ABA Standards recognize three mental states: intent, knowledge, and negligence. A lawyer acts with "intent" if he or she acts with "the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. A lawyer acts with "knowledge" if he or she is "conscious[ly] aware[ ] of the nature or attendant circumstances of the conduct," but does not have a "conscious objective or purpose to accomplish a particular result." *Id.* "Negligence" is "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

Here, the trial panel expressly found that the accused committed several of the violations intentionally. With regard to other violations, the trial panel made findings that lead to the same conclusion. Finally, for some violations, the rule violated itself requires that an accused act at least with knowledge, but the trial panel's findings suggest that the accused in fact acted with intent.

Based on the trial panel's findings and our own *de novo* review of the record, we find that the accused's conduct was intentional for many—and indeed most—of the violations. In particular, the trial panel expressly found that, in the Brady-Aiello matter, the accused intentionally delayed and protracted the resolution of the Brown estate matter. The trial panel also found that the accused was intentionally nonresponsive to many of the Bar's repeated investigatory requests for information in that matter. We agree with both findings. The trial panel made no express finding as to whether the accused's excessive and illegal charges in that matter were intentional. Implicit in the trial panel's discussion is the suggestion that, at least as to some of the double-billing and similar problems, the accused's conduct may have been negligent only. In one regard, however, the trial panel's

express findings support a conclusion that the accused's conduct was intentional. Specifically, the trial panel found that the accused "ignored" his statutory obligation to seek court approval before collecting a $14,000 fee for his services as personal representative. The record amply supports that finding. We therefore find that, with regard to his collection of the $14,000 fee, the accused acted intentionally. *See In re Knappenberger,* 344 Or at 573 (similarly finding that, when accused charged a fee for a Social Security claim without following the approval procedures that he knew first must be followed, the accused's conduct was intentional).

With regard to the other matters that led to the proceeding against the accused (Rubeo, Hernandez, Schauermann, Montalbano, and OSB matters), the trial panel noted that they generally involved "actions (or lack of action) taken by the Accused as his suspension [in *Paulson II*] loomed." As to those actions and inactions, in all but the Rubeo matter, the panel found that the accused's conduct was not only intentional, but reflected a deliberate disregard for the accused's duties. The trial panel explained:

> "While the facts of the Brady-Aiello matter are significant and the Accused should have responded more thoroughly and expeditiously in Rubeo, neither rise to the level of disbarment in the eyes of the panel. It is the actions of the Accused after his suspension in *Paulson II* that amount to thumbing his nose at virtually all things important to the profession—the courts, the clients, and the justice system itself—that support our decision [to disbar]."

The trial panel then discussed specific actions and inactions involved in those other matters and the accused's mental state at the time. The trial panel specifically found that, in filing the several motions for postponement and abatement on the first day of his suspension, the accused's conduct was deliberate, was intended to delay those proceedings, and was done for selfish motives:

> "The motions [for postponement and abatement] that were filed on October 15, 2006 are essentially identical. They are designed to take each case off the docket so the

Accused can get through his suspension and take the cases up again. The Loucks matter is the most egregious. We conclude the Accused drafted each document for a selfish purpose and with an eye for delay. We find the Accused engaged in this pattern of conduct deliberately with the intent to accomplish a specific result."

The trial panel did not address specifically the accused's failure to withdraw from representing his clients or to take steps to protect his clients' interests (such as by transferring the cases to new counsel). But, implicit in the above quote from the trial panel's opinion is its assessment that, in those regards as well, the accused's conduct was deliberate and motivated by selfish concerns rather than by his clients' interests. We agree and so find.

Finally, the trial panel considered the accused's mental state in failing to cooperate with the Bar's investigation in the Hernandez, Schauermann, Montalbano, and OSB matters. The trial panel found:

"The record reveals that the Accused deliberately ignored [the Bar's] requests for information until he could ignore them no further. The responses he provided were late; they were evasive and ambiguous; they were often non-responsive and non-substantive. We can conclude only that the Accused made a deliberate decision to respond to the Bar in a manner he knew to be contrary to the rules of professional conduct. After all, the matters at issue here are not the first disciplinary proceedings to which the Accused has been a party. He offered absolutely no reason or evidence as to why he could not or did not respond to the Bar's inquiries as requested. He was playing the system; for what benefit, the panel can only speculate."

We concur in all regards in the trial panel's assessment of the accused's mental state at the time he engaged in the violations at issue.

## C. *Injury*

As to injury, the trial panel concluded that the accused's violations inflicted both actual and potential injury

to the accused's clients, to the legal system, and to the profession. The trial panel did not elaborate in the part of its opinion discussing the appropriate sanction. Earlier in its opinion, it had detailed those injuries in its findings and conclusions.

The Brady-Aiellos were required to wait unnecessarily for years before the Brown estate was settled and distributed. They incurred substantial attorney fees to obtain assets that should have been distributed to them "without fanfare." The state likewise incurred actual injury in the form of unnecessary litigation and costs. The court system, too, devoted resources unnecessarily due to the accused's conduct in delaying and protracting the small estate matter. The accused charged and collected (although he eventually had to repay) an illegal and excessive fee. We conclude that, as to the Brady-Aiello matter and the violations in those regards, the injuries that the accused caused to the Brady-Aiellos and to the legal system were actual and serious.

The accused's unlawful practice of law and failure to withdraw in the Hernandez, Schauermann, Montalbano, and OSB matters inflicted both actual and potential injuries to his clients. There were actual injuries in all cases, in that the accused's self-interested motions to postpone and abate the cases caused delays in all of the matters that likely would not have occurred had the accused withdrawn from representation earlier and assisted in transferring the cases to other attorneys. The potential injuries that could have come to pass in these matters were even more serious. The accused's conduct had the potential to leave his clients high and dry in such a way as to seriously prejudice the merits of their cases. There also is *potential* serious injury to the legal system, the profession, and to the public when, as here, a lawyer (1) engages in the unauthorized practice of law; (2) is unwilling to comply with a court-ordered suspension; (3) makes deliberate misrepresentations to a tribunal to delay cases for selfish motives; and (4) engages in dishonesty or misrepresentations that reflect adversely on the lawyer's fitness to practice law.

In the Loucks child custody matter, the trial panel found that the accused's conduct caused actual and serious

injury to his client. The matter involved significant interests (a parent's custodial rights and allegations that the child was being abused). The client, without notice from the accused, was required to scramble on the eve of trial to obtain new representation. The resolution of that child custody matter was delayed as a result, when it otherwise could have gone to trial as scheduled. The accused's client in that case did not testify; only the opposing lawyer in the matter did so. But from that lawyer's description of the circumstances, the trial panel concluded that the client suffered additional actual injury in the form of "significant anguish and uncertainty" as a result of the accused's conduct. *See In re Jones*, 312 Or at 618 (client anxiety and aggravation is actual injury); *In re Arbuckle*, 308 Or 135, 140, 775 P2d 832 (1989) (same). We agree with the trial panel that, in the Loucks child custody matter, the injuries to the client were both actual and serious.

Finally, the trial panel specifically found that the accused's failure to cooperate with the Bar's investigation of the complaints in these several matters resulted in actual injury to the Bar and the legal system generally in the form of "significant cost." *See also In re Haws*, 310 Or at 751 (describing actual injury caused by noncooperation generally with Bar investigations). We conclude, in addition, that a lawyer's failure to cooperate with the Bar's investigatory efforts, when that failure is persistent and intentional, as it was in these matters, poses *potential serious* injury to the profession and to the public as well. As we earlier observed, the lawyer disciplinary system is not punitive; it is protective. When a lawyer intentionally evades the procedures by which the Bar can determine if the lawyer is one who has not discharged, will not discharge, or is unlikely to properly discharge his or her professional duties, the interests of clients, the public, the legal system, and the legal profession not only may be potentially injured, but they potentially may be *seriously* injured.

## D. *Preliminary Sanction*

The trial panel determined that the preliminary sanction was disbarment because the accused had violated several duties in an intentional or knowing manner. The

ABA Standards provide that disbarment is generally appropriate in each of several circumstances presented by this case.

Under ABA Standard 8.1(a), disbarment is generally appropriate when a lawyer "intentionally or knowingly violates the terms of a prior disciplinary order and such violation causes injury or potential injury to a client * * *." Here, as we have found, the accused did not withdraw from representing several clients and took few or no steps to aid them in transferring their cases to other lawyers in advance of his suspension. The accused also practiced law while suspended. His misconduct caused both actual and potential injury to his clients, and, in the Loucks child custody case, the actual injury was serious.

Under ABA Standard 4.41(b), disbarment is generally appropriate when a lawyer "knowingly fails to perform services for a client and causes serious or potentially serious injury to a client[.]" The accused's conduct in the Bradly-Aiello matter and the Loucks child custody matter caused serious actual injury in those cases. In the other matters involved in this case, the accused's conduct caused potential serious injury to his clients.

Under ABA Standard 6.11, disbarment is generally appropriate "when a lawyer, with the intent to deceive the court, makes a false statement * * * or improperly withholds material information, and causes serious or potentially serious injury to a client or party[.]" The accused intentionally made false statements in his motions to postpone and abate in an effort to deceive the courts about his suspended status. In the Loucks child custody matter in particular, the client was seriously injured.

Under ABA Standard 7.1, disbarment is generally appropriate when a lawyer "knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer" if that conduct "causes serious or potentially serious injury to a client, the public, or the legal system." Here, the accused systematically and intentionally failed to cooperate with the Bar's investigation of complaints against him despite a clear duty to do so.

The accused's conduct resulted in potentially serious injury to his clients, the public, and the legal system.

The evidence supports the trial panel's preliminary sanction.

E. *Aggravation and Mitigation*

As we earlier described, the next step in determining the appropriate sanction is to consider aggravating and mitigating factors. With regard to relevant aggravating factors, the trial panel found:

"Disciplinary History. The Accused has a history of disciplinary offenses. In [*Paulson I*, 335 Or 436], he was reprimand[ed] in a dispute over fees. He was found to have engage[d] in conduct prejudicial to the administration of justice in [*Paulson II*, 341 Or 13]. He was suspended for an additional four months in [*Paulson III*, 341 Or 542], for violation of DR 1-103(C) [failure to cooperate in a disciplinary investigation], DR 4-101(B)(1) and (2) [knowingly revealing the secret/confidence of a client and using a confidence or secret to the disadvantage of a client]; and DR 7-104(A)(I) [communication with a represented party]. A number of the rules at issue in this prior discipline are at issue again in the matters now before this panel. Moreover, it appears that at least two of the prior cases seemed to be at various stages of the disciplinary process at the time the current matters arose. The panel views the prior disciplinary history and the timing of that history juxtaposed to the present matters as quite significant. [*See* ABA Standards] at 9.22(a).

"Selfish Motives. In the case at bar, we have found that the Accused acted with dishonest and/or selfish motives. We focus on a selfish motive here. In Brady-Aiello, the Accused churned the file to increase his fees. The motions filed after the date of suspension in *Paulson II* seem designed to allow the Accused the opportunity to take the cases over after his suspension. He repeatedly failed to cooperate with the Bar's investigations in an effort to either avoid or delay facing the consequences of his misconduct. The Accused repeatedly became so entrenched in his own battles, he lost focus of the need to actually assist his clients. [*See* ABA Standards] at 9.22(b).

"Multiple offenses. [*See* ABA Standards] at 9.22(d).

"Refusal to acknowledge the wrongful nature of his conduct. [*See* ABA Standards] at 9.22(g).

"Substantial experience in the practice of law. [*See* ABA Standards] at 9.22(i).

"Bad faith obstruction of the disciplinary proceeding. *See* [ABA Standards] at 9.22(e)."

Next, the trial panel concluded that the only potential mitigating factor that applied was the delay in the disciplinary process in these matters. *See Paulson II*, 341 Or at 32-33 (delay in investigating and filing formal disciplinary complaint can be mitigating factor in determining sanction); *see also* ABA Standards 9.32(i) (listing "delay in disciplinary proceedings" as possible factor in mitigation). The trial panel declined to give that factor weight, however, because it found that the accused "himself was a significant contributing factor to the delay in this case."

We agree with the trial panel's assessment of the relevant aggravating factors in this case. We likewise concur that the only potential mitigating factor—delay—is not such a factor here, because of the accused's role in contributing to the delay.

## F. *Oregon Case Law*

The trial panel examined prior Oregon disciplinary cases involving similar misconduct on a lawyer's part to determine if disbarment in this matter would be consistent with that case law. The trial panel determined that the cases were of limited help—both cases resulting in disbarment and those resulting in suspension—because most involved violations arising out of a single matter, rather than multiple causes of complaint in multiple matters that suggested "a pattern of problematic behavior." And none of the cases that the trial panel reviewed involved such a "complete lack of regard for the orders of the Oregon Supreme Court—indeed disdain for the rules of the court and the Bar[.]" Finding no case law to the contrary, the trial panel concluded that disbarment, given the accused's pattern of behavior and his mental state, was appropriate.

As we have noted in the past, case-matching in the context of disciplinary proceedings "is an inexact science." *In re Stauffer*, 327 Or at 70. That is especially so for cases involving multiple violations in multiple matters, because in many such proceedings the accused declines to contest the charges or the sanction. This court has often ordered disbarment without any extensive discussion of the conduct justifying it, even in past years when review was automatic.[26] Still, we think that this court's past cases do provide some guidance and that they demonstrate the appropriateness of disbarment in this instance.

Some of the accused's violations, had they occurred in a single matter, or had they been singular violations, likely would have justified a long suspension in and of themselves. In past cases, this court has imposed suspensions of anywhere from one to many years for violations in a single matter that were analogous to any of several of those arising out of the multiple matters involved in this case. For example, this court has emphasized that knowingly or intentionally making false statements under oath is "among the most serious acts of misconduct that a lawyer can commit." *In re Dugger*, 334 Or 602, 626, 54 P3d 595 (2002). We therefore have ordered long suspensions, in the absence of significant mitigating circumstances, for false representations, knowingly made under oath or affirmation, like those that the accused made in his motions seeking postponement and abatement.[27] Likewise, we have ordered long suspensions for

---

[26] *See, e.g., In re Cue*, 336 Or 281, 82 P3d 708 (2003) (no appearance by accused); *In re Barrett*, 332 Or 422, 29 P3d 1137 (2001) (accused appeared); *In re Taub*, 326 Or 325, 327, 951 P2d 720 (1998) (accused admitted facts that formed basis of multiple violations but asserted that mental condition had prevented forming the requisite mental state).

[27] *See, e.g., In re Davenport*, 334 Or 298, 49 P3d 91, *modified on recons*, 335 Or 67, 57 P3d 897 (2002) (two-year suspension based on several sworn misrepresentations made in connection with a single matter); *In re Staar*, 324 Or 283, 924 P2d 308 (1996) (two-year suspension for making knowingly false statements in a support of a petition for a restraining order); *In re Wyllie*, 327 Or 175, 957 P2d 1222 (1998) (two-year suspension for false statement regarding compliance on MCLE report). We have declined to suspend based on such conduct, however, where the resulting harm was "trivial" in nature. *See In re Kumley*, 335 Or 639, 75 P3d 432 (2003) (accused's misconduct in describing himself as an "attorney" in forms that he submitted to two state agencies in connection with candidacy for elected office

intentional conduct in protracting legal proceedings unnecessarily or vexatiously and for charging an excessive or unlawful fee in a single matter.[28] On the other hand, we have ordered disbarment for conduct that otherwise would justify a long suspension when the accused has a history of misconduct that has resulted in prior disciplinary sanctions. *See In re Miller*, 310 Or 731, 801 P2d 814 (1990) (lawyer kept estate open for six years, misrepresented status of estate to court, and collected an excessive fee; conduct warranted disbarment given accused's history of serious misconduct in two prior cases).

This case distinguishes itself from those in which we have ordered long suspensions because of the multiple different matters in which the accused committed the violations. In addition, the accused has a history of past violations. We agree with the trial panel that, in combination, the accused's current and past conduct demonstrate a persistent disregard for the rules of professional conduct and the duties that the accused owes to his clients, the public, the legal profession, and the legal system.

That disregard is particularly evidenced by the accused's intentional practice of law despite this court's order of suspension. The accused's conduct in that regard might, without more, justify his disbarment. In *In re Devers*, 328 Or 230, 974 P2d 191 (1999), among other conduct involving the practice of law, the accused lawyer continued to represent a client in settlement negotiations despite his suspension; the accused lawyer did so because the client, who knew of the suspension, asked the lawyer to continue in the matter. This court determined that disbarment was "clearly" an appropriate presumptive sanction for the accused's conduct. *Id.* at 243. The court further concluded that there were both aggravating factors (prior disciplinary record; a pattern of

---

warranted reprimand, and not suspension). As we already have concluded, the harm caused by the accused's false representations in this case was not trivial.

[28] *See, e.g., In re Altstatt*, 321 Or 324, 897 P2d 1164 (1995), *cert den*, 517 US 1129 (1996) (one-year suspension for lawyer who, in representing an estate in a single matter, obtained fees without court approval and let his self-interest affect his professional judgment); *In re White*, 311 Or 573, 815 P2d 1257 (1991) (three-year suspension for lawyer who used litigation in a single matter as a tool to harass, rather than to resolve client's dispute, and made knowingly false statements in course of litigation).

misconduct involving same violations; multiple offenses; refusal to acknowledge wrongful nature of conduct; and substantial experience in the practice of law) and mitigating factors (personal problems; cooperation with disciplinary proceedings; good reputation). *Id.* at 243-44. The court ultimately determined, however, that the mitigating factors were not of sufficient weight to reduce the sanction; the court ordered disbarment as a sanction. *Id.* at 245.

Here, there are no mitigating factors. There are only significant aggravating factors. Any one of several violations that the accused committed in the various matters involved here, were it a single violation with those aggravating factors, could justify a long suspension. And the accused's unauthorized practice of law alone is enough to justify disbarment. Considering the violations in combination, however, and in the context of the several aggravating factors present in this case, disbarment is well-warranted under Oregon case law.

## VI. CONCLUSION

Having found, as did the trial panel, that the accused violated DR 1-102(A)(4), DR 2-106(A), RPC 1.16(a)(1) and (d), RPC 3.3(a)(1), RPC 5.5, RPC 8.1(a)(2), and RPC 8.4(a)(3) and (4); having considered the relevant ABA Standards; and having evaluated the applicable Oregon case law, we determine that the appropriate sanction for the accused's violations in this matter is disbarment.

The accused is disbarred, commencing 60 days from the date of the filing of this decision.