Submitted on the record April 21, accused suspended from the practice of law for 120 days, effective 60 days from the date of the filing of this decision July 1, 2004

## In re Complaint as to the Conduct of

### ANTHONY L. WORTH,
*Accused.*

### (OSB 02-34; SC S50682)

92 P3d 721

Anthony L. Worth, Pendleton, filed the brief for himself.

Jane E. Angus, Assistant Disciplinary Counsel, Lake Oswego, filed the briefs for the Oregon State Bar. With her on the briefs was Thomas C. Howes.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar alleged that the accused knowingly made misrepresentations in violation of DR 1-102(A)(3), engaged in conduct prejudicial to the administration of justice in violation of DR 1-102(A)(4), failed to provide his client with competent representation in violation of DR 6-101(A), and neglected a legal matter in violation of DR 6-101(B). A trial panel of the Disciplinary Board found that the accused had not made misrepresentations but that he had committed the other charged violations. The trial panel suspended the accused from the practice of law for 90 days.

The Bar seeks review of the trial panel's decision, arguing that the accused knowingly misrepresented facts in violation of DR 1-102(A)(3). The Bar also argues that we should suspend the accused from the practice of law for one year rather than 90 days. The accused, for his part, does not challenge the trial panel's findings that he engaged in conduct prejudicial to the administration of justice, that he failed to provide his client with competent representation, and that he neglected a legal matter. He argues, however, that he did not knowingly misrepresent anything. On *de novo* review, we conclude that the accused violated DR 1-102(A)(3), DR 1-102(A)(4), DR 6-101(A), and DR 6-101(B), and suspend him from the practice of law for 120 days.

Because the only contested issue concerning the accused's conduct is whether he made statements that constituted misrepresentations, we focus on that inquiry and summarize the facts necessary to put it in context. Gayalene Buck rented the bottom floor of a house in Pendleton to Lupe Pena. Gayalene's son, Buddy Buck, moved into the top floor of the house. According to Pena, she repeatedly found Buddy in her part of the house, without her consent, watching her television, eating her food, and using her telephone to make long distance calls. Pena moved out when she could not tolerate Buddy's conduct any longer and sought legal help from the accused.

On May 10, 2000, the accused filed a complaint against the Bucks, alleging unlawful entry and violations of

the landlord-tenant laws. The accused served the defendants in August 2000. On August 18, the accused sent a letter to the defendants' counsel, Michael Collins, asking him to file an answer. The letter also stated, incorrectly, that a request for production was enclosed. Collins filed an answer on August 25 and notified the accused that, contrary to the statement in his letter, no request for production had been enclosed.

In early September, the accused gave Collins some documents that Collins had requested. On September 20, the trial court administrator notified the parties that he was assigning the case to mandatory arbitration. Under the local rules, the parties had 21 days in which to select an arbitrator and 49 days after that to set the case for a hearing before the arbitrator. Also, on September 20, the defendants offered Pena $500 to settle the case. The accused communicated the offer to Pena, which she declined. According to Collins, the accused never communicated Pena's decision to him. One other event occurred in September. On September 28, the accused sent Collins a letter suggesting that they call each other regarding the court-ordered arbitration.

Over the next several months, the accused spoke informally to Collins about discovery. On February 20, 2001, the court sent the parties a notice of intent to dismiss the case because no action had occurred within the last two months. The notice stated that, to avoid dismissal, "a written motion and order must be submitted by [March 22, 2001]." On April 4, 2001, the accused served a request for production on defendants. That same day, the accused submitted a motion to retain the case on the court's docket. The motion recited that the "[p]laintiff is continuing to attempt to resolve this matter with the [d]efendant[s] short of going to trial."

The defendants objected to the plaintiff's motion and submitted an affidavit from their lawyer in support of their position. In his affidavit, Collins stated that the accused had not responded to his settlement offer, that no arbitrator had been selected, and that the case was in essentially the same posture that it had been when the plaintiff filed it almost a year earlier.

At a hearing on June 29, 2001,[1] the trial court considered the parties' positions and discussed discovery issues. The trial court told the parties that it would retain the case on the docket but that it expected the accused to comply with the arbitration rules and set the case for a hearing before an arbitrator on or before August 17, 2001. The local arbitration rules put the burden on the plaintiff to notify the arbitrator and arrange for the arbitration. At some point that day, either the court or the parties selected Steven Bloom as their arbitrator.

On July 24, 2001, the accused sent a notice to Collins that he would take the defendants' depositions on August 14, 2001.[2] In a cover letter, the accused stated that he had "arbitrarily selected this date without consultation with [Collins]" and asked Collins to let him know if the date was inconvenient. Collins called the accused on July 25, 2001, the day he received the accused's letter, and also wrote him a letter confirming their conversation. Collins told the accused that he was going to be out of the office from August 6 through August 17 on a planned vacation. Collins noted the possibility that he might be available for depositions on the morning of August 10. The parties, however, could not find a mutually convenient date for the depositions in August,[3] and the accused sent Collins a letter on September 17, 2001, suggesting that he take the defendants' depositions in October.

On September 21, Collins moved to dismiss for want of prosecution. Collins submitted an affidavit, reciting the history of the case. The accused filed an affidavit, dated

---

[1] The court initially set the hearing on the plaintiff's motion on May 1, 2001. The accused, however, was going to be out of the country on that date, and the court reset the hearing to June 29.

[2] The accused dated the cover letter July 19, 2001. However, he dated the enclosed notices of deposition July 24, 2001. Collins received the accused's cover letter and notices of deposition on July 25, 2001, and we conclude that the accused did not send them until July 24.

[3] After the close of business on August 2, 2001, Collins faxed a letter to the accused saying that his vacation plans had changed, that he would be in the office the week of August 13 to 17 and they could take depositions that week, but that he needed to hear back from the accused by the next morning if the accused wanted to hold the depositions that week. As Collins explained at the hearing, he needed to hear back quickly because he was leaving the next day to go on vacation. The accused did not learn of the letter until the afternoon of August 3 and called Collins on August 6, after Collins had left on vacation.

October 11, 2001, opposing the motion to dismiss. In his affidavit, the accused stated that, since filing the complaint, he had "been trying to complete discovery in [the] matter," that, in his view, completing discovery was a prerequisite to settling the case, and finally that "[t]he last time [p]laintiff scheduled depositions, counsel for [d]efendants postponed due to his vacation schedule."

At the hearing on the motion to dismiss, the accused told the trial court that he had "bent over backwards" to get the depositions scheduled, that he had "really tried to push" the case forward, but that Collins had not cooperated. The trial judge noted that, as he remembered, he had told the parties that they had to set the case for arbitration by August 17, 2001, and that the accused was responsible for contacting the arbitrator and "mak[ing] sure that that was done." In response to that observation, the accused stated:

> "I called Mr. Bloom's office. I was responded to with a phone call, not from Mr. Bloom, but from somebody in his office, asking if discovery was complete, and I had to say no, and I issued the notice to take depositions."

The accused explained that he did not believe that it was the court's intent for the parties "to arbitrate willy-nilly, whether Mr. Collins defeats my efforts to get discovery or no."

Collins responded that the accused had not sent him a notice of deposition until almost a month after the court directed that the arbitration be set within 49 days. Collins explained that he had responded immediately to the accused's request and had attempted to work with him. He also noted that "this is the first time I have heard that he's made any attempt to contact Mr. Bloom's office." The accused replied that he had been reasonable in scheduling discovery and "to suggest that we have to go to arbitration in a situation where I'm systematically being denied depositions, I just don't think that's correct." He then added:

> "And it's not coincidental that my notice to take depositions went out within three days of being told by Mr. Bloom's office that I needed to do discovery, if I was going to get it."

The court then called Bloom. When asked about the case, Bloom explained that he "d[id] not recognize th[e] case name and [he] d[id]n't remember ever, or my office, getting a call from [the accused]." Bloom explained that, if someone calls and he cannot take the call, he gets a phone message asking him to call back. However, he had not gotten any message on the accused's case.

In response to Bloom's statements, the accused stated:

"When I called, and my recollection is that I was called back, but I'm willing to be wrong and willing to say that during the brief conversation, I was asked if discovery was complete, and when I responded that it wasn't, I was told that we should endeavor to complete discovery before we try to set an arbitration date. That made sense to me, so I didn't follow up further with Mr. Bloom."

The court then asked Bloom whether that would be his normal procedure, and he answered "no." Bloom explained:

"We have some very nice, competent legal secretaries in our office, but they don't know discovery from a hole in the ground, and they would never, and they certainly don't have that instruction from me, and this is the first time I have ever heard anybody direct a question to a secretary about—or my secretary coming back and saying, before Bloom will take an arbitration, is discovery complete?"

When the accused explained that he had not asked whether Bloom would take the case but what he needed to do to get the arbitration set, Bloom responded that he "set[s] all [his] own stuff. The secretaries don't do it." Having heard Bloom's statements, the court granted the motion to dismiss without further discussion.

The Bar received a complaint concerning the accused's conduct, and the trial panel found that, despite numerous warning signals, the accused failed to take steps to move Pena's case forward or assure compliance with the trial court's June 29 order that the case be set for arbitration by

August 17. The trial panel concluded that this course of conduct constituted neglect in violation of DR 6-101(B) and prejudiced the administration of justice in violation of DR 1-102(A)(4). The trial panel found that the accused failed to provide Pena with competent representation in violation of DR 6-101(A). The trial panel concluded, however, that the accused had not made a misrepresentation in violation of DR 1-102(A)(3).[4]

As noted, the accused does not challenge the trial panel's conclusion that he violated DR 1-102(A)(4), DR 6-101(A), and DR 6-101(B), and we agree that the accused violated those rules. The Bar argues, however, that the accused also made misrepresentations in his April 4, 2001, motion, in his October 11, 2001, affidavit, and during the November 9, 2001, hearing. We turn to those claims.

■      DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." Dishonesty, fraud, deceit, and misrepresentation are related but separate concepts, *see In re Leonard*, 308 Or 560, 569, 784 P2d 95 (1989) (stating principle), and the Bar has alleged that the accused knowingly made misrepresentations in violation of DR 1-102(A)(3). To establish that proposition, the Bar must prove by clear and convincing evidence that the misrepresentations were "knowing, false, and material in the sense that the misrepresentations would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001); *In re Boardman*, 312 Or 452, 456-57, 822 P2d 709 (1991). The Bar need not prove that the accused actually misled anyone, however. *Boardman*, 312 Or at 456-57.

■      In deciding whether the Bar met its burden of proof, we review the evidence *de novo*, giving weight to the trial panel's credibility findings. *In re Gallagher*, 332 Or 173, 175-77, 26 P3d 131 (2001). With that standard of review in mind,

---

[4] In reaching that conclusion, the trial panel discussed statements that the accused made in his April 4, 2001, motion to retain the case on the docket and his October 11, 2001, affidavit. It did not discuss the statements that the accused made during the November 9, 2001, hearing.

we turn to the first of four statements that, the Bar contends, constitutes a misrepresentation.

■ The trial court notified the accused on February 20, 2001, that it intended to dismiss the case unless the accused showed good cause why the case should be continued. On April 4, 2001, the accused filed a motion to retain the case on the docket and recited in the motion that the "[p]laintiff is continuing to attempt to resolve this matter with the [d]efendant short of going to trial." The Bar argues that, because the accused had taken no steps to resolve the case since September 2000, the accused "could not have reasonably believed that his statement was true."

It is true, as the Bar argues, that the accused had not done very much in the period between September 2000 and April 2001 to justify his statement that he "[wa]s continuing to attempt to resolve" the case short of going to trial. The accused testified, however, that he believed that the case would settle once he got discovery and that he had spoken informally with Collins about discovery between September and April. Collins, for his part, acknowledged that, between September 20, 2000, and April 4, 2001, he and the accused "may have had some kind of a brief courthouse steps kind of thing or something [regarding depositions]. We may have had a couple of conversations like that somewhere along the line."

Although the accused's efforts to resolve the case between September and April can hardly be described as vigorous, he did make some efforts during that time to discuss discovery and, in his view, work toward the case's resolution. Given that evidence, we find that the Bar has not proved by clear and convincing evidence that the accused's statement on April 4, 2001—that he was "continuing to attempt to resolve" the case short of trial—was false.

■ We turn next to the accused's statements in his October 11, 2001, affidavit. The Bar focuses on two statements. The Bar notes initially that the accused stated that the "[p]laintiff has, since the filing of the complaint, been trying to complete discovery in this matter." Although the Bar contends that this statement is false, we reach a different conclusion. The accused may not have been trying very hard

to complete discovery, but he had been trying. He had given the defendants' counsel some documents in September 2000. He had spoken informally to the defendants' counsel about discovery in the following months. He served a request for production on the defendants in April 2001 and served notices of deposition on them in July 2001. The Bar has not proved by clear and convincing evidence that the statement that the plaintiff had been trying to complete discovery is false.

■　　The Bar also notes that, in his October 11, 2001, affidavit, the accused swore that the "last time plaintiff scheduled depositions, counsel for [d]efendants postponed due to his vacation schedule." As the Bar argues, the accused's use of the phrase "[t]he last time plaintiff scheduled depositions" implies that the plaintiff had scheduled depositions on more than one occasion, an implication that the accused has admitted.[5] That implied statement is not accurate. The accused had scheduled depositions once, not multiple times. The statement also was knowing and material. If true, the statement implied that the accused had acted more diligently than he had and could have affected how the trial court evaluated the defendants' motion to dismiss. *See Eadie*, 333 Or at 57-58 (explaining that statement concerning judge's intentions was material because it could have affected decision-making process). We accordingly find that the second statement in the October 11, 2001, affidavit is a misrepresentation.

■　　The Bar argues that the accused made misrepresentations on a third occasion. At the November 9, 2001, hearing on the defendants' motion to dismiss, the accused told the trial court that, when he called the arbitrator's office, "I was asked if discovery was complete, and when I responded that it wasn't, I was told that we should endeavor to complete discovery before we try to set an arbitration date." The accused's statement is at odds with that of the arbitrator. Bloom testified that his office had no record or knowledge of Pena's case being assigned to him for arbitration. He had not spoken with either the accused or Collins about the case, nor did his staff

---

[5] In its amended complaint, the Bar alleged that, in his October 11, 2001, affidavit, the accused "expressed or implied" that "depositions in the case had been scheduled on more than one occasion." The accused admitted that allegation.

remember any call from the accused. Bloom also explained, and his staff verified,[6] that his staff would not have asked about discovery or discussed scheduling arbitration with a lawyer. Rather, they would have taken a message and left that task to Bloom.

We find that Bloom's staff did not ask the accused if he had completed discovery, nor did they tell him to do so before attempting to set the arbitration date.[7] It follows that, when the accused made those statements, he knew that they were not true. Finally, the statements were material. If believed, the statements would have provided the accused with an excuse—the arbitrator's staff instructed him to delay setting the hearing date—for failing to comply with the court's earlier instructions. We conclude that the accused violated DR 1-102(A)(3) when he told the trial court at the November 9, 2001, hearing that Bloom's staff told him to complete discovery before scheduling an arbitration date.

■ Having concluded that the accused violated DR 1-102(A)(3), DR 1-102(A)(4), DR 6-101(A), and DR 6-101(B), we turn to the appropriate sanction. We first consider: (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury caused by the conduct. American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards); *In re Kluge*, 332 Or 251, 259, 27 P3d 102 (2001). We next decide whether any aggravating or mitigating circumstances exist. ABA Standard 3.0; *Kluge*, 332 Or at 259. Finally, we consider the sanction in light of existing case law. *Id.*

---

[6] The accused stipulated that, if the arbitrator's staff were called to testify, the staff would testify that the arbitrator handles all decisions on his cases, that the arbitrator's staff did not remember a telephone conversation with the accused, that the arbitrator's staff did not remember telling any person that he or she should get back to the arbitrator when discovery was complete, that they would not have done so, and that only the arbitrator would make that decision.

[7] The trial panel did not address this issue explicitly. We assume that the trial panel implicitly credited the accused's testimony that his memory was that he had called Bloom's office and received similar instructions. Although we give weight to the trial panel's credibility findings, our review of the record leads us to a different conclusion. *See In re Starr*, 326 Or 328, 338 n 4, 952 P2d 1017 (1998) (reaffirming that, on *de novo* review, court may draw different conclusion concerning credibility).

The accused violated his duty to his client by failing to act diligently on Pena's behalf in prosecuting her case. ABA Standard 4.4. The accused also violated his duty to provide his client with competent legal service. ABA Standard 4.5. In addition, the accused violated his duty to the legal system to refrain from making false statements to a court. ABA Standard 6.1. Finally, the accused's misrepresentations to the court violated his duty to the legal profession. ABA Standard 7.0.

We turn next to whether the accused acted with intent, knowledge, or negligently.[8] The Bar does not appear to argue that the accused acted intentionally when he made misrepresentations to the court. *Cf. Kluge*, 332 Or at 263 (recognizing that Bar may establish higher mental state in sanctions hearings than it alleged in its complaint). It appears to argue instead that he acted knowingly, and we agree. The Bar also argues that the accused acted knowingly when he failed to pursue Pena's case in violation of DR 6-101(A), DR 6-101(B), and DR 1-102(A)(4). The Bar reasons that the accused "could not have been unaware that [his conduct] was creating difficulties for his clien[t]." *In re Recker*, 309 Or 633, 640, 789 P2d 663 (1990) (internal quotations omitted). We reach a different conclusion. We find that the accused was unaware, until it was too late, that his inaction would result in the trial court's dismissing Pena's case. He did fail, however, to heed a substantial risk that the trial court would impose that sanction and thus acted negligently when he failed to pursue Pena's case in violation of DR 6-101(A), DR 6-101(B), and DR 1-102(A)(4).

We turn next to the actual or potential harm, if any, created by the accused's misconduct. The accused's neglect of Pena's case caused her potential injury when the trial court dismissed her case.[9] *See In re Worth (Worth I)*, 336 Or 256,

---

[8] The ABA Standards define "intent" as "[t]he conscious objective or purpose to accomplish a particular result." ABA Standards at 7. "Knowledge" is "[t]he conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* "Negligence" is "[t]he failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

[9] In his brief on review, the accused asserts that Pena has received full compensation for her losses. Although the record does not support that assertion, the Bar acknowledges in its reply brief that the assertion is correct.

275, 82 P3d 605 (2003) (recognizing proposition). His conduct also caused her actual injury—*viz.*, the anxiety and frustration caused by requiring her to seek redress through the Professional Liability Fund. *See In re Schaffner*, 325 Or 421, 426, 939 P2d 39 (1997) (anxiety and frustration caused by lawyer misconduct considered actual injury). Finally, the accused's misrepresentations to the court on October 11, 2001, and November 9, 2001, caused potential injury to the court system.

Under the ABA Standards, suspension is generally appropriate when a lawyer knowingly fails to perform services for a client, or engages in a pattern of neglect, and causes injury to the client. ABA Standard 4.42. Although the accused did not knowingly neglect Pena's case, his repeated failure to pursue Pena's case reveals a pattern of neglect. Similarly, under the ABA Standards,

> "[s]uspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court * * * and causes an adverse or potentially adverse effect on the legal proceeding."

ABA Standard 6.12. Our initial analysis leads to the conclusion that, under the ABA Standards, suspension is the appropriate sanction.

Having determined the potential range of sanctions, we consider any aggravating or mitigating factors. We find four aggravating factors in this case. First, the accused has substantial experience in the practice of law. He has been practicing law since 1965. ABA Standard 9.22(I). Second, the accused's client was vulnerable. Pena had limited financial resources to pursue her case and little understanding of the legal system. ABA Standard 9.22(h). Third, the accused committed multiple offenses in that he both failed to pursue Pena's case and made misrepresentations to the court. ABA Standard 9.22(d). Finally, the record reflects a pattern of misconduct in that the accused has engaged in similar misconduct in both *Worth I* and in this case. ABA Standard 9.22(c); *see Worth I*, 336 Or at 280 (suspending accused for 90 days for neglecting multiple cases and misrepresentation).[10]

---

[10] Because this court had not adjudicated the earlier charge before the trial panel imposed a sanction on the accused, the earlier offense is not a prior

We also find four mitigating factors. First, the accused did not act with a selfish motive. ABA Standard 9.32(b). Second, the accused cooperated during the investigation of the complaint. ABA Standard 9.32(e). Third, the accused presented credible witnesses who testified to his good character and reputation. ABA Standard 9.32(g). Finally, the accused repeatedly acknowledged during the hearing that his failures had resulted in the dismissal of Pena's complaint. ABA Standard 9.32(l).[11]

Although we have found an identical number of aggravating and mitigating factors, we conclude that the aggravating factors outweigh slightly the mitigating ones. *See In re Martin*, 328 Or 177, 193, 970 P2d 638 (1998) (stating that court must engage in qualitative balance of aggravating and mitigating factors). We note that the purpose of sanctions is not to penalize the accused but to protect the public and the integrity of the legal profession. *In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989). Viewed in that light, the accused's recent pattern of neglect and misstatements takes on greater weight. It suggests that, even though the accused has a long record of service to the public, a longer suspension may be appropriate to ensure that the more recent pattern of misconduct in *Worth I* and this proceeding does not recur.

Finally, we turn to case law for guidance. In *In re Butler*, 324 Or 69, 921 P2d 401 (1996), the accused lawyer stipulated that he had violated DR 6-101(B) and DR 1-102(A)(3) by allowing a client's case to be dismissed with prejudice and then misleading the client about the status of the case. The *Butler* court found that the accused lawyer knowingly neglected his client's case and intentionally hid that fact from his client. 324 Or at 73. In addition, the *Butler* court found that the accused lawyer's misconduct was aggravated by the fact that he had substantial experience in the practice

---

disciplinary offense within the meaning of ABA Standard 9.22(a). *In re Jones*, 326 Or 195, 199-200, 951 P2d 149 (1997). The earlier misconduct is relevant, however, because it demonstrates that the accused's ethical violations in this proceeding are part of a larger pattern of misconduct. ABA Standard 9.22(c); *see In re Butler*, 324 Or 69, 73, 921 P2d 401 (1996) (stating principle).

[11] During the hearing, the accused was suffering from various physical ailments. He does not argue, however, that we should consider those ailments as mitigating factors. *See* ABA Standard 9.32(h) (amended 1992) (listing physical disability as mitigating factor).

of law and that, at the time the misconduct occurred, he was under investigation for similar misconduct in an unrelated matter. *Id.* at 73.[12] The *Butler* court suspended the accused lawyer for a year. *Id.* at 76.

This case is both similar to and different from *Butler*. As in *Butler*, the accused neglected his client's case, causing it to be dismissed. Also, as in *Butler*, the accused made misrepresentations. Finally, the accused's conduct, like Butler's, occurred while he was under investigation for similar violations in an unrelated matter. The cases differ in other respects, however. The accused's misrepresentations were knowing while Butler's were intentional. In *Butler*, no mitigating circumstances counterbalanced the aggravating factors; here, mitigating factors argue for a lesser sanction. In light of those differences, we do not agree with the Bar that a one-year suspension, which the court imposed in *Butler*, is appropriate. Rather, we conclude that a 120-day suspension will be sufficient to protect the public and the integrity of the legal profession.

The accused is suspended from the practice of law for 120 days, effective 60 days from the date of the filing of this decision.

---

[12] The *Butler* court did not find any mitigating factors.