Argued and submitted September 15, accused suspended from practice of law for 120 days, effective 60 days from date of filing of decision December 24, 2009

In re Complaint as to the Conduct of

# JAY R. JACKSON,
*Accused.*

## (OSB Case No. 07-54; SC S056461)

223 P3d 387

Jay R. Jackson, Lebanon, filed the brief and argued the cause *in propria persona*.

Stacy J. Hankin, Assistant Disciplinary Counsel, Tigard, filed the brief and argued the cause for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer discipline case, the Bar charged the accused with neglect of a legal matter, conduct prejudicial to the administration of justice, knowingly making a false statement of fact to a tribunal, and conduct involving dishonesty that reflects adversely on the lawyer's fitness to practice law. The accused's primary defense is factual; he contends that the Bar failed to prove that he neglected his client and made misrepresentations to the court. On *de novo* review, we find that the Bar proved the charged violations by clear and convincing evidence, and we suspend the accused for 120 days.

The accused has been a lawyer since 1976. In 2005, he began working as the administrator of a charter school operated by People Involved in Education (PIE). The accused still continued to handle a few cases and used space in a trailer that PIE owned for his law office. In the fall of 2005, the accused agreed to represent a coworker, who was in the process of divorcing her husband. The accused's client (the wife) and her husband had already reached an agreement on parenting time and property division, and the accused filed a petition for the dissolution of the marriage on December 19, 2005, in Linn County Circuit Court.

On December 26, 2005, someone broke into and vandalized the trailer that the accused used for his law office.[1] The accused's files were "trashed," including the wife's dissolution file. At that point, the dissolution file consisted of the petition and information that the wife had given the accused. The accused reconstructed most, if not all, of the wife's file[2] and, after December 26, 2005, stopped using the trailer as his law office.

The husband retained Edward Daniels to represent him in the dissolution proceeding, and Daniels filed a response to the dissolution petition on January 6, 2006. Linn

---

[1] The break-in was discovered on December 26. It could have occurred before that date. There is also some evidence that there were a series of break-ins or attempted break-ins at the trailer. Although we discuss the evidence later in greater detail, we find that, to the extent that more than one break-in occurred, the final break-in occurred on December 26, 2005.

[2] The accused could not identify any specific documents that he did not recover, although he suspected he might not have reconstructed the file completely.

County has an established procedure for resolving dissolution proceedings. Once the petition and response have been filed, the court seeks to resolve the proceeding within eight to 12 months. Towards that end, the court sets an early resolution conference. If the case involves child custody matters, the court refers the case to mediation, which usually will occur before the early resolution conference. At the early resolution conference, the court will try to determine which matters are contested. If disputed property issues remain, the court refers the case to arbitration and sets a date for a final resolution conference after the arbitration. The purpose of the final resolution conference is to determine whether any disputed issues remain for trial.

After the husband filed his response to the petition in January, the court scheduled the early resolution conference for February 23, 2006. At that conference, Daniels represented that both parties were in mediation where they were formulating a parenting plan, that the parties did not think that there would be any property issues, but that spousal support might be an issue. He explained that "what we would like to do is set a settlement conference out about six to eight weeks maximum, which would give us time to get through a mediation," and that he anticipated that all the issues could be resolved at the settlement conference. The accused agreed with Daniels' representation and added that he thought "that [it] would be appropriate to set it out for a settlement conference." Consistent with the parties' representations, the court scheduled a settlement conference for April 20, 2006. Daniels also noted that the parties had not exchanged discovery but that there might not be a need to do so.

On April 20, the accused appeared at the settlement conference and told the court that "he hadn't spent the time he needed or had been too busy to look at the file or something to that effect and he wasn't prepared to do a settlement conference."[3] The court ordered arbitration to attempt to settle the remaining property issues and scheduled a final resolution conference for July 20, 2006. The court appointed an

---

[3] Daniels testified before the trial panel that the accused made the statement quoted above (or one similar to it) at the settlement conference. The accused could

arbitrator and directed that the arbitration be completed by June 13, 2006. The court sent a notice to the parties identifying the arbitrator and directing the parties to provide a calendar response to the arbitrator within ten days, showing the dates on which they would be available for arbitration.

On May 1, 2006, Daniels sent his calendar response to the arbitrator and the accused. The accused testified before the trial panel that he had written "OK" on a copy of Daniels' calendar response, signed it, and sent the marked copy of Daniels' calendar response to the arbitrator and, he presumed, Daniels.[4] Neither Daniels nor the arbitrator received the accused's response. On May 18, 2006, the arbitrator's assistant called the accused and left a message on his voicemail for him to mail his calendar response.[5] The accused did not respond to the message. On May 30, 2006, the arbitrator's office left another message for the accused telling him that they could not proceed until they heard from him and again asking for a response. The accused did not respond.

On June 28, 2006, after learning that Daniels also had not received any communication from the accused, the arbitrator's assistant sent a letter to the court arbitration coordinator, copying both attorneys. The letter stated that arbitration had not been scheduled because the arbitrator had never heard from the accused despite having left messages for him. The accused received the June 28 letter but did not respond to it. He later testified that he assumed that the issue would be discussed at the final resolution conference, which was scheduled in approximately three weeks.

On July 20, 2006, both parties appeared before the circuit court for the final resolution conference. After the court called the case, the following exchange took place:

---

not recall what he had said but "guess[ed] that would be the best evidence of what I said." Daniels made virtually the same representation when he and the accused appeared before the circuit court on July 20, 2006. The accused did not dispute Daniels' representation then either.

[4] The accused could not remember specifically whether he had served a copy of his response on Daniels but stated that that would be his custom.

[5] Initially, the arbitrator's assistant called the wrong number. She found the correct number, got the accused's voicemail, and left two messages, the first on May 18 and the second on May 30.

"[THE ACCUSED]:    Your Honor, if I may—

"THE COURT:    Yeah.

"[THE ACCUSED]:    —I think it's incumbent on me to explain what's going on here.

"THE COURT:    Well, I notice there's a letter in the file from [the arbitrator] and I remember reading this and noting that we would address this today.

"And, I guess, the problem, [counsel], is nobody could find you.

"[THE ACCUSED]:    That's correct, Your Honor.

"The condensed version is that my office—all my files, materials have been burglarized and vandalized actually a series of times. Everything was either taken or destroyed for all my calendaring, billing. All my record keeping electronically.

"However, whoever did this was fairly methodical in vandalizing all of the paperwork, dumping all of the file cabinets. What I have been attempting to do is organize and straighten this stuff out.

"However, in the meantime, I developed some form of an eye ailment that I'm being treated for which, unfortunately, one of the side effects of that is it made it very difficult for me to read anything to sort through the paperwork.

"I realize this creates a huge inconvenience for the Court, opposing party and counsel, and my client.

"* * * I don't know that there's much of anything that I could have done to head this off."

The court and the parties discussed the best way to proceed in light of those events. The court noted that the accused had to get "all the discovery. If some of it's been stolen, we got to get it again" and stated that the accused needed to ask Daniels for the discovery that was missing. Daniels, for his part, noted that the accused had never called and said, "you know, I lost everything, update it, or anything like that." The accused acknowledged that he had not contacted Daniels to ask for replacement documents. He explained that, "however poor judgment that may have been, I was still hoping

that I could resurrect and reorganize enough of my file to be able to proceed with this thing."

At the end of the final resolution conference, Daniels noted that he had "real serious questions about all of what's been said" and asked the court if he could ask the accused two things: "the physical address of the office that was burglarized and when it was burglarized." The accused gave the address for the trailer but was not sure when the burglaries had occurred. When Daniels asked, "Can you give a month? Like was it May or June?," the accused said, "Well, it's been a couple of times. Two times since our last court appearance," which the accused has acknowledged referred to the settlement conference in April.

The court referred the matter once again to the arbitrator, directed the parties to proceed with arbitration, and set the next court date for October 19, 2006. During the next two months, the accused took no steps to proceed with the arbitration. Rather, on September 13, 2006, the husband asked Daniels to withdraw as his attorney, and Daniels did so. The husband and wife then entered into a settlement agreement, and the accused filed a final stipulated judgment on October 17, 2006.

The Bar filed a formal complaint against the accused. For the first cause of complaint, the Bar asserted that the accused's lack of preparation for the April 20, 2006, settlement conference and his failure to communicate with the arbitrator constituted violations of Rule of Professional Conduct (RPC) 1.3 ("A lawyer shall not neglect a legal matter entrusted to the lawyer.") and RPC 8.4(a)(4) (making it professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice").[6] In its second cause of complaint, the Bar alleged that, when the accused told the court on July 20, 2006, that multiple burglaries had affected his handling of the dissolution proceeding, that

---

[6] The Bar's complaint cited RPC 8.4(a)(3) rather than RPC 8.4(a)(4). The Bar's subsequent filings cited 8.4(a)(4) for the first cause of complaint and the Bar made the mistake known to the trial panel during the hearing. The accused stated that he had no objection to the Bar's amendment to its complaint.

statement was false. The Bar alleged that the accused's conduct violated RPC 3.3(a)(1) (prohibiting a lawyer from knowingly "mak[ing] a false statement of fact or law to a tribunal") and RPC 8.4(a)(3) (making it professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law"). The accused filed an answer denying the Bar's allegations.

At a hearing before the trial panel, the accused testified that he had in fact returned a calendar response to the arbitrator,[7] and he identified exhibit 16 as a copy of the marked response that he returned.[8] The accused also testified that he may not have been as clear as he could have been in identifying when the break-ins occurred. The trial panel issued an opinion finding that the Bar had proved all of its allegations. Among other things, it did not credit the accused's testimony at the disciplinary hearing. After considering aggravating and mitigating circumstances, including prior disciplinary sanctions against the accused, the trial panel suspended the accused for 180 days.

On review, the accused raises six arguments. He argues initially that the trial panel erred "in failing to hold the Bar to its burden of proving any alleged misconduct by clear and convincing evidence." The accused's second, third, fourth, and fifth arguments assert that the Bar did not prove the four charged violations by clear and convincing evidence. The accused's final argument concerns the sanction; on that issue, he argues only that no sanction should be levied because he did not violate any ethical rules.

■ The accused's first argument is brief. Essentially, he argues that, because the trial panel did not state specifically that the Bar had proved its case by "clear and convincing evidence," the trial panel failed to apply the correct standard of proof. It is true that the trial panel's opinion does not state the standard of proof that it applied. As the Bar points out, however, the pleadings that the Bar filed with the trial panel

---

[7] As noted, the accused testified that he had taken Daniels' calendar response, written "OK" on it, signed it, and returned it to the arbitrator and, he assumed, Daniels.

[8] The Bar offered exhibit 16 into evidence.

stated the correct standard of proof. For example, in its written closing argument, the Bar began by asserting that the evidence established violations by "clear and convincing evidence" and concluded that "[t]he credible evidence is clear and convincing." Nothing in this record suggests that the trial panel used any other standard of proof. Beyond that, this court reviews the facts in disciplinary proceedings *de novo*. ORS 9.536(2); *In re Koch*, 345 Or 444, 447, 198 P3d 910 (2008). Even if the trial panel used the wrong standard, this court's application of the correct standard of proof on *de novo* review cures any possible error.

The first cause of complaint alleges that the accused's failure to prepare for the April 20 settlement conference, to provide a calendar response to the arbitrator, to respond to the arbitrator's calls, and to schedule arbitration constitute neglect and conduct prejudicial to the administration of justice. The accused has not disputed that, at the April 20 settlement conference, he told the trial court, that "he hadn't spent the time he needed or had been too busy to look at the file or something to that effect and he wasn't prepared to do a settlement conference." Rather, his factual dispute focuses on the events surrounding arbitration.

On that issue, the accused testified before the trial panel that he had mailed the arbitrator and presumably Daniels his calendar response and that he did not receive the voicemail messages that the arbitrator's assistant left for him. As noted, however, neither the arbitrator nor Daniels received the accused's calendar response. Similarly, the accused never responded to the voicemail messages that the arbitrator's assistant left for him, and the only explanation that the accused offered at the July 20, 2006, final resolution conference and later at the disciplinary hearing was that his voicemail must not have been working. The accused, however, never identified any other voicemail messages that he did not receive, although he speculated that some messages might have been missed.

To credit the accused's testimony, we would have to conclude that his letters to both the arbitrator and Daniels were lost in the mail and that he never received the two voicemail messages that the arbitrator's assistant left for

him. Objectively, the coincidence that all four messages would have been lost is difficult to credit. *See State v. Johns,* 301 Or 535, 552-53, 725 P2d 312 (1986) (discussing similar issue). The accused's testimony that he in fact returned the calendar response also is inconsistent with his actions at the July 20 hearing. The accused received the June 28 letter from the arbitrator's assistant, which told the court that arbitration had not been scheduled because the assistant had never received a calendar response from the accused "in spite of the fact that I have left telephone messages requesting that he send the response." The accused, however, never called the arbitrator's assistant or Daniels after he received the June 28 letter to let them know that he in fact had sent the arbitrator a calendar response. Nor did he tell the court at the final resolution conference that he in fact had sent in the calendar response, even though the court inquired about it. The accused's silence before the court is inconsistent with his later testimony before the trial panel.

■       The trial panel, as noted, did not find the accused's testimony credible. In discussing the subjective reasons for its credibility determination, the trial panel explained: "First of all, the manner in which the Accused testified was not credible. His mannerisms and speech levels when discussing this issue were not indicative of a person who was being candid. He was clearly uncomfortable while responding to direct questions on this issue." We defer to the trial panel's subjective credibility findings, *In re Fitzhenry,* 343 Or 86, 103 & n 13, 162 P3d 260 (2007), and the panel's subjective credibility finding is consistent with our objective credibility finding. We find by clear and convincing evidence that the accused did not submit his calendar response to the arbitrator and that he received but did not respond to the voicemails regarding that failure.

■■       Having resolved those factual disputes, we turn to whether the accused's conduct violated RPC 1.3 or RPC 8.4(a)(4). RPC 1.3 provides that "[a] lawyer shall not neglect a legal matter entrusted to the lawyer." Although one act of negligence is not sufficient to violate RPC 1.3, either a course of neglectful conduct or an extended period of neglect is sufficient. *In re Koch,* 345 Or at 452. In this case, the accused engaged in a course of neglectful conduct. The accused was

not prepared for the settlement conference on April 20 that he had requested, he failed to send in his calendar of available dates after receiving the notice of the appointment of an arbitrator, he failed to respond to two voicemail messages reminding him to send in the response, and he took no steps to pursue arbitration after the court referred the matter, once again, to the arbitrator at the July 20 hearing and told the parties "we need to get that going as soon as possible." Any of those enumerated events can—and will—occur on occasion, but having all of them occur in the same case and in the serial manner in which they occurred is sufficient to constitute neglect. *See id.* at 452-53 (accused's repeated failure to contact client and respond to client's inquiries over a six-month period constituted neglect); *In re Knappenberger*, 337 Or 15, 23-24, 90 P3d 614 (2004) (accused's repeated failure to contact client or respond to events related to an unsuccessful appeal constituted neglect under a previous, but identically worded, rule of professional conduct). The accused knowingly neglected his client's legal matter under RPC 1.3.

■■  The accused's conduct also violated RPC 8.4(a)(4). RPC 8.4(a)(4) prohibits an attorney from "engag[ing] in conduct that is prejudicial to the administration of justice." To establish a violation under RPC 8.4(a)(4), the Bar must show that

> "(1) the accused lawyer's action or inaction was improper; (2) the accused lawyer's conduct occurred during the course of a judicial proceeding or a proceeding with the trappings of a judicial proceeding; and (3) the accused lawyer's conduct had or could have had a prejudicial effect upon the administration of justice."

*In re Kluge*, 335 Or 326, 345, 66 P3d 492 (2003) (setting forth this standard for violations of a previous, but identically worded, rule of professional conduct); *see In re Paulson*, 346 Or 676, 683, 216 P3d 859 (2009) (adopting that standard for RPC 8.4(a)(4)). We find that the accused's failure to be prepared at the April 20 settlement conference and his repeated failure to respond to the arbitrator was improper, occurred during a dissolution proceeding, and prejudiced the administration of justice.

On the last point, Linn County has established a procedure for resolving dissolution proceedings quickly and efficiently. One part of that procedure is to arbitrate property disputes before the final resolution conference so that the court can narrow the remaining issues, if any, for trial. Here, the accused failed to respond to the court's order to schedule arbitration and the arbitrator's attempts to secure his compliance. Not only did the accused's failure to respond unnecessarily expend the time of the arbitrator and his staff, it undercut the essential purpose of the final resolution conference. Instead of narrowing the issues for trial, the court spent its time at the final resolution conference trying to understand what had happened to derail the dissolution proceeding and how it could get the case back on track.

Additionally, the accused's failure to be prepared for the April 20 settlement conference that he requested (and that he continued to hold out as the best way of resolving the dissolution proceeding) unnecessarily expended judicial resources. We conclude that the accused's actions, taken together, prejudiced the administration of justice. *See In re Gresham*, 318 Or 162, 166, 864 P2d 360 (1993) ("The accused's repeated failures to do anything to administer the estate—notwithstanding his repeated assurances to the court—were prejudicial to the administration of justice, requiring the court repeatedly to request information from the accused.").

The Bar's second cause of complaint alleges that the accused's statements to the trial court on July 20, 2006, violated RPC 3.3(a)(1) and RPC 8.4(a)(3). As noted, at the earlier April settlement hearing, the court had directed the parties to go to arbitration so that it could determine at the final resolution conference in July what, if any, issues remained for trial. On June 28, the arbitrator's assistant wrote the court that it had not been possible to schedule arbitration because the accused had not notified the arbitrator when he would be available to arbitrate despite her voicemail messages requesting a response. The accused began the July 20 hearing by attempting to "explain what's going on here." He told the trial court that "all my files, materials have been burglarized and vandalized actually a series of times" and, more specifically, "[t]wo times since our last court appearance." He

explained that all his calendaring and billing had been destroyed and stated that, although he had not asked Daniels for missing documents, "I was still hoping that I could resurrect and reorganize enough of my file to be able to proceed with this thing."

■      The Bar argues that the accused's explanation was false or misleading in two respects. First, it argues that no burglaries occurred after December 26, 2005, and, at a minimum, after April 20, 2006—the date that would have affected the accused's ability to proceed with the arbitration. Second, the Bar argues that, even if the trailer was burglarized after April, the accused misled the trial court into believing that those break-ins were the reason that he had failed to respond to the arbitrator's request and proceed with the dissolution case. The Bar notes that, because the accused stopped working out of the trailer after December 2005, any subsequent break-ins would have had no material effect on his ability to represent the wife's interests.

We begin with the number and timing of any burglaries. The evidence clearly establishes that, on or about December 26, 2005, someone broke into the trailer that the accused used for office space and completely vandalized its contents, including the accused's legal files. The testimony regarding the existence and timing of other break-ins was mixed. The owner of the property on which the trailer was located works approximately 150 feet from the trailer and walks or drives by it daily. He testified that, within a month after the December break-in, the trailer's windows and doors were boarded up and that he never saw evidence of a later break-in. Another witness, Cody Northern, is involved in PIE and helped maintain the trailer. He testified that two break-ins or attempted break-ins occurred before the major break-in, but he could not identify the date when any of the break-ins had occurred. His mother, Mary Northern, testified that more than one break-in occurred, and her testimony primarily is consistent with her son's that the break-ins preceded the major break-in in December. One part of her testimony, however, may permit a weak inference that some break-ins occurred after December 2005.[9] Finally, at the disciplinary

---

[9] In response to the accused's question whether she remembered him mentioning break-ins after the December 2005 break-in, Mary Northern said she couldn't

hearing, the accused sought to clarify his response to the trial court in July. He testified that,

> "in responding in court that day about the later burglaries, what I should have made more clear was the fact that I don't know when any of the burglaries occurred. I personally don't have that knowledge. The reference that I should have made clearer is that I became aware of at least two others after the last—after the April court date."

There are no police reports or other documentation of any burglaries after December 26, 2005, and we conclude that no break-ins occurred after that date. The accused's statement to the court on July 20, 2006, that two burglaries had occurred after April 20, 2006 was, at a minimum, too broad, as he later acknowledged.[10]

The Bar also argues that the accused represented to the trial court that he was unable to proceed with the case because of the break-ins. In responding to the court's inquiry about the status of the case, the accused explained that his office had been broken into and that his calendar had been destroyed. Later in the colloquy, he added that he was in the process of reconstructing the wife's file. The accused offered that explanation to the court to excuse his failure to submit the case to arbitration or otherwise proceed with the case before the final resolution conference. The difficulty with that explanation, however, is that the accused did not use the trailer for his legal work after December 26, 2005. At that point, his file was limited to the petition and information that the wife had provided him. The wife was able to provide duplicate copies of most, if not all, the information, and we find that the December break-in did not prevent the accused from proceeding with the arbitration in any material way.

More specifically, the court did not send the notice to the parties directing them to proceed to arbitration until April 2006. The accused received that notice long after he had

---

remember the time frame but did remember the accused mentioning things like the door is just totally shot now. The accused then asked "And that would have been after the initial," to which Northern replied "Okay."

[10] We need not decide whether the accused knowingly made a false statement to the trial court when he stated that two break-ins had occurred after April 20, 2006. As explained below, we find that the accused's explanation for his inability to proceed with the case was false and intentional.

moved his law office out of the trailer, and any break-ins that occurred at the trailer either before or after the receipt of that notice did not affect the accused's ability to pursue arbitration as the court had directed. We find that, when the accused represented that the break-ins had affected his ability to proceed with the case, that representation was false. We also find that the accused acted intentionally in making that misrepresentation; he intended for the court to conclude that he had been unable to proceed because of a series of break-ins when that was not true.[11]

RPC 3.3(a)(1) provides that a "lawyer shall not knowingly * * * make a false statement of fact or law to a tribunal." Given our factual findings, we conclude that the accused violated that rule. RPC 8.4(a)(3), by contrast, is not limited to statements made to tribunals. It provides that a lawyer shall not "engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]" *Cf. In re Carpenter*, 337 Or 226, 232, 95 P3d 203 (2004) (explaining that Disciplinary Rule 1-102(A)(3) applied to misconduct outside the practice of law that showed that the "lawyer lacks those characteristics that are essential to the practice of law"). We conclude that, in the circumstances of this case, the accused's intentional misrepresentation to the trial court "reflects adversely on [his] fitness to practice law." We find that the Bar proved both violations by clear and convincing evidence.

We now turn to the appropriate sanction. As this court has previously stated, the purpose of attorney discipline is not retributive but is instead designed to protect the public and the justice system from lawyers who have not, will not, or are unlikely to properly discharge their professional duties. *In re Paulson*, 346 Or at 712. In determining a presumptive sanction we consider "(1) the ethical duty violated; (2) the lawyer's mental state; and (3) the actual or potential injury caused" by the conduct. *Id.* We then adjust the presumptive sanction based on the presence of aggravating or

---

[11] Our conclusion that the accused intentionally misrepresented his reasons for failing to proceed with the case is consistent with the trial panel's credibility finding. On this issue, the trial panel found that, "[w]hile the Accused denies making a false representation to the court, again we find * * * the manner of testimony to not be credible."

mitigating circumstances. *Id.* Finally, we consider whether the sanction is consistent with Oregon case law. *Id.*

The accused in this case has violated his duties to his client and the legal system. The accused's failure to prepare for the settlement conference and his failure to schedule arbitration breached his duty of diligence to his client. *See* American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) 4.4. The accused's false statements and misrepresentations to the court at the July 20 court appearance violated his duty to the legal system. ABA Standard 6.1 ("False Statements, Fraud, and Misrepresentation").

Regarding the accused's mental state, the trial panel found that the accused acted intentionally in making false representations to the court at the July 20 court appearance and acted knowingly when he appeared unprepared at the April 20 settlement conference and when he later failed to schedule arbitration. " 'Intent' is the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. " 'Knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* We agree with the trial panel's findings. As discussed above, given the context and the questions from the trial court, the accused was aware that the court wanted to know why arbitration was not scheduled. The accused gave a dishonest explanation to make the court believe that he should not be held responsible. In doing so, the accused acted intentionally. The accused knowingly failed to be prepared for the conference and failed to schedule arbitration. The accused was aware of the settlement conference and the required arbitration but failed to act.

Turning to the question of injury, we find by clear and convincing evidence that the accused caused both actual and potential injury. The legal system suffered actual injury when the accused made false statements to the court. The court was forced to make decisions based on inaccurate information provided by the accused. Any time a court is forced to make decisions with incomplete or inaccurate information,

the legal system is harmed. The accused's client and the judicial system suffered, at a minimum, potential injury when the accused failed to prepare for the settlement conference and failed to schedule the arbitration, because his actions potentially delayed the dissolution proceedings.[12]

With the above in mind, we turn to the presumptive sanction. The recommended sanctions generally follow the specific duties violated—in this case, the duty to the client and the legal system. Suspension is the appropriate presumptive sanction when an attorney "knowingly fails to perform services for a client and causes injury or potential injury to a client." ABA Standard 4.42(a). When an attorney "knowingly engages in * * * conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law[,]" a reprimand generally is appropriate. ABA Standard 5.13. Without serious or potentially serious injury, suspension is generally appropriate when an attorney makes a false statement to a court. See ABA Standards 6.11-6.12. On balance, we conclude tentatively that suspension is appropriate in this case.

We next turn to aggravating and mitigating factors. The Bar identifies four aggravating circumstances. Three are relatively straightforward: the accused had a selfish motive in making false representations to cover his own failure to act, ABA Standard 9.22(b), the accused committed multiple offenses, ABA Standard 9.22(d), and the accused has substantial experience in the practice of law, having been admitted to practice in 1976, ABA Standard 9.22(i). We agree that those factors are present. The other aggravating factor, prior disciplinary history, ABA Standard 9.22(a), requires greater discussion.

The accused has a history of admonition and discipline for neglect. The accused's first instance of neglect occurred in 1987 when he accepted a letter of admonition for neglecting a legal matter and failing to cooperate with the

_____

[12] It is possible that this was also actual injury, but we believe that, in this case, it is too uncertain for us to say definitively that the dissolution proceeding would have concluded earlier absent the accused's conduct. The parties eventually settled on their own terms, and it is unclear on this record whether this would have occurred earlier.

disciplinary authority. *See In re Jackson (Jackson I)*, 10 DR Rptr 199, 202 (1996) (using the 1987 letter of admonition as an aggravating factor); *In re Jackson (Jackson II)*, 13 DR Rptr 164, 168 (1999) (same). The accused was disciplined for similar conduct in 1996. The accused stipulated to a public reprimand in that proceeding for neglecting a legal matter when he undertook representation of a probate case but failed to pursue the case and failed to communicate with the client. *Jackson I*, 10 DR Rptr at 201. In 1999, the accused received a 30-day suspension for failing to return a client's property and failing to provide an accounting for a retainer despite repeated requests from the client. *Jackson II*, 13 DR Rptr at 164-66.

The accused's history thus consists of a letter of admonition for neglect, a stipulated reprimand for neglect in *Jackson I*, and an adjudicated determination in *Jackson II* that the accused failed to return a client's property and failed to provide an accounting—specific types of neglect related to the accused's clients. The adjudication in *Jackson II* is similar to this case in another respect. In *Jackson II*, the accused submitted billing statements to the trial panel to establish that he had provided an accounting to his clients; however, the trial panel found in that case that "the monthly billing statements provided by the Accused were never sent to [his clients]." 13 DR Rptr at 166. In this case, the accused identified an exhibit in the disciplinary proceeding—a copy of a marked calendar response—as support for his testimony that he had returned that response to the arbitrator. As in *Jackson II*, we find that the accused never returned the response.

With that background in mind, we turn to the appropriate weight to give those prior disciplinary actions. A letter of admonition is not a sanction or part of a prior record of discipline imposed on a lawyer; however, it " 'can be relevant to the determination of the appropriate sanction in a subsequent proceeding * * * because it demonstrates that the accused lawyer has engaged in [similar] misconduct in the past.' " *In re Bettis*, 342 Or 232, 241, 149 P3d 1194 (2006) (quoting *In re Cohen*, 330 Or 489, 500, 8 P3d 953 (2000)). Similarly, the weight that we give stipulated reprimands has varied with the context of each case. *See Koch*, 345 Or at 457

(declining to give great weight to a single stipulated reprimand because of the multiple reasons that lawyers may agree to relatively light sanctions); *In re Knappenberger*, 340 Or 573, 585, 135 P3d 297 (2006) (even though the accused had committed multiple previous violations, the stipulated reprimand involved dissimilar conduct). In this case, the accused has a history of neglectful conduct and a history of gradually escalating responses (a letter of admonition, a stipulated reprimand, and a 30-day suspension); as an integral part of that history, the stipulated reprimand in 1996 takes on greater significance.

■ The accused does not identify any mitigating factors. The Bar notes, however, that the prior disciplinary offenses were remote in time, and the trial panel found that the accused represented the wife *pro bono* when she could not otherwise obtain legal counsel.[13] Although mitigating factors are present, we find that the aggravating factors, including the numerous instances of prior discipline, outweigh the mitigating factors.

■ We finally turn to our own precedent. This case involves both client neglect and misrepresentations to the court. As this court recently noted, in "disciplinary cases involving dishonesty and misrepresentation, this court has ordered sanctions ranging from six-month suspensions to disbarment." *In re Wilson*, 342 Or 243, 251, 149 P3d 1200 (2006). Similarly, "the court has imposed sanctions ranging from a 60-day to a one-year suspension when a lawyer's neglect and inattention has resulted in lost opportunities for his or her client."[14] *Koch*, 345 Or at 458.

The Bar argues that this case is similar to *In re Worth*, 337 Or 167, 92 P3d 721 (2004). In *Worth*, a lawyer neglected a legal matter and made misrepresentations to the court, ultimately resulting in the dismissal of his client's

---

[13] The trial panel specifically found that the mitigation factor of "cooperative attitude toward [disciplinary] proceedings," ABA Standard 9.32(e), did not apply because "the Accused chose to excuse what happened in this case with excuses and explanations that do not fit the facts[, and] it appears that the Accused was attempting to 'cover up' for his mistakes." We agree with the trial panel.

[14] We note that the lost opportunities in this case, the potential for an earlier resolution for the wife's case, is speculative; in previous cases, the injury has been actual and documented lost opportunities, such as dismissal of a case.

case. *Id.* at 169-73. This court found four aggravating factors, including one instance of prior discipline, and four mitigating factors. *Id.* at 179-80. This court concluded that the "aggravating factors outweigh[ed] slightly the mitigating ones," and, after looking at this court's precedent, suspended the accused for 120 days. *Id.* at 180-81.

*Worth* has some similarities to and differences from the present case. In *Worth*, the accused made two misrepresentations and the ultimate result, a dismissal of the accused's case, was more severe than what occurred in this case. In this case, the accused made an intentional misrepresentation to the court in July, which he compounded by trying to cover up that misrepresentation in the subsequent disciplinary proceeding. Moreover, the accused's history of prior instances of neglect and similar conduct, accompanied by gradually increased responses (admonition, reprimand, and a 30-day suspension), has not been sufficient to conform his behavior to ethical standards and demonstrates that a greater sanction is required here. On balance, we conclude that the sanction that we imposed in *Worth*—a 120-day suspension—is also appropriate here.

The accused is suspended from the practice of law for 120 days, effective 60 days from the date of the filing of this decision.